GRIFFITH, Circuit Judge,
dissenting with respect to retrogression in Congressional District 25:
I, too, reaffirm our decision at summary judgment that crossover districts are protected under section 5, and I agree that enacted CD 25 is not an ability district. But I cannot join in my colleagues’ proposed test for the existence of a crossover district, which is divorced from Supreme Court precedent and dangerously broad. I first explain why the test to find a protected crossover district is more demanding than that my colleagues employ. Then I show that even under their standard, the record does not contain the “more exacting evidence” needed to show that benchmark CD 25 is a crossover district.[1] Texas v. United States, 831 F.Supp.2d 244, 268 (D.D.C.2011).
As my colleagues’ analysis shows, Blacks and Hispanics vote cohesively in CD 25, and their support is necessary to victory. But as we have already agreed, these factors alone are not enough to show that minority voters can effectively exercise their electoral power to elect their preferred candidates. My colleagues and I agree that section 5 does not protect every district in which “Anglos and minorities vote together to elect a candidate,” or “that elects a Democratic candidate no matter how small its minority population.” Majority Op. at 151, 150. We disagree over where section 5 draws the line between protected crossover districts and nonprotected districts that simply vote Democratic.
*191 My colleagues hold that a district is protected when minority voters “effectively exert[ ] their political power within the voting coalition.” Under this novel rephrasing of “ability to elect,” they establish a false dichotomy, testing “whether minorities in CD 25 exert their political power effectively in the tri-ethnic coalition, or are rather just ‘hangers-ori to the choices of Anglo voters.” CD 25 Majority Op. at 181. Although my colleagues do not provide a full definition of what it means for minority voters to “effectively exert[ ] their political power,” it appears that they view anything more than “hanging on” as sufficient to prove that the district is protected. But this overbroad result runs headlong into the 2006 amendments to the VRA. As we noted at summary judgment, Texas, 831 F.Supp.2d at 251, Congress amended the VRA to make clear that section 5’s retrogression prong did not include “influence districts” — ones in which minorities play a “substantial, if not decisive, role in the electoral process,” Georgia v. Ashcroft, 539 U.S. 461, 482, 123 S.Ct. 2498, 156 L.Ed.2d 428 (2003); see also LaRoque v. Holder, 650 F.3d 777, 793-94 (D.C.Cir.2011). The majority’s “effectively exert” test sweeps too wide because it provides no way to distinguish between unprotected influence districts, where minority voters play a substantial role, and protected crossover districts, in which they have an ability to elect.
The line between influence and protected crossover districts[2] is admittedly difficult to draw. But Supreme Court precedent — which my colleagues do not cite as support for their “effectively exert” test[3] —helps us at least to sketch its location, and CD 25 falls on the unprotected side. Whenever the Court has examined crossover districts, it has spoken of Anglo voters providing supplemental support to minority voters. See Bartlett v. Strickland, 556 U.S. 1, 13, 129 S.Ct. 1231, 173 L.Ed.2d 173 (2009) (plurality opinion) (defining a crossover district as one in which the minority group can “elect the candidate of its choice with help from voters who are members of the majority and who cross over to support the minority’s preferred candidate” (emphasis added)); Voinovich v. Quilter, 507 U.S. 146, 158, 113 S.Ct. 1149, 122 L.Ed.2d 500 (1993) (describing a crossover district as one in which minority voters can elect “their candidate of choice with the assistance of crossover votes from the white majority” (emphasis added)). The Court’s language reflects its assumption that minority voters take the leadership role in a crossover district, with Anglo voters providing necessary — but ultimately *192 secondary — support. Likewise, the Court’s use of vivid, active phrases to describe the part minority voters play in a crossover district suggests a leading role. The Court has stated that minority voters must “attract [ ] sufficient cross-over votes from white voters,” Voinovich, 507 U.S. at 154, 113 S.Ct. 1149 (emphasis added), and “pull, haul, and trade” to elect their preferred candidates, Johnson v. De Grandy, 512 U.S. 997, 1020, 114 S.Ct. 2647, 129 L.Ed.2d 775 (1994) (emphases added). This is the line we must draw: the minority group must lead in order to have the ability to elect. The leadership needed to prove ability can be demonstrated in a variety of ways, such as by consistently casting the majority of votes for the winning candidate in most elections, coordinating get-out-the-vote drives, or recruiting the lion’s share of candidates. It makes little difference how that leadership is asserted. What is crucial is that minority voters do more than provide the margin of victory or have simply an equal voice in a district’s electoral decisions.[4]
Such a showing is especially important in a district like CD 25, where minority voters comprise only 35% of the Citizen Voting Age Population (CVAP). Although there is evidence that a coalition of Black, Hispanic, and some Anglo voters consistently elects minority-preferred candidates in CD 25, there is none showing that minority voters lead the effort. For example, no testimony was presented that they play a critical role in recruiting the candidates who run in CD 25 (in contrast to Senator Davis’s uncontroverted testimony about SD 10), are instrumental in the coalition’s efforts to get out the vote (in contrast to the Asian-American community in HD 149), or that minorities consistently make up the majority of a winning candidate’s votes. The record shows only that the minority-preferred candidate wins consistently in CD 25, but that fact alone tells us little (and perhaps nothing) about who is responsible for engineering these wins.
Because there is no evidence that minorities lead in CD 25,1 would stop my analysis here and find that it is not protected. But even assuming my colleagues’ test is correct, and that a district in which power is shared equally would satisfy such a test, there is insufficient evidence in the record to support a finding of equal electoral power. First, I address the anecdotal evidence regarding CD 25; then I turn to the expert and statistical evidence about the district’s voter turnout and electoral results.
My colleagues place much weight on the anecdotal testimony of one .of Travis County’s State House representatives, Dawnna Dukes, and Travis County Attorney David Escamilla regarding the tri-ethnic coalition in Travis County. I am not confident their testimony can bear this weight. First, evidence about Travis County voting patterns does not adequately describe minority voting power within CD 25 because, as discussed in more detail below, less than half of Travis County is in CD 25, and approximately 40% of CD 25 lies outside *193 Travis County. More importantly, this testimony — at best — only indicates that minority votes are needed to win, not that minority voters have an equal role in the coalition. The testimony boils down to this: to win local elections in Travis County, a candidate must have the support of Black and Hispanic voters. For instance, Rep. Dukes testified that candidates running in Travis County cannot win without support from “the progressive Anglo, Black, and Hispanic communities.” Trial Tr. 106:10-18, Jan. 19, 2012 PM. Escamilla testified about a candidate who lost the primary because he was “unable to gain significant support from the Hispanic or African American community.” Defs.’ Ex. 735, Pre-Filed Direct Test, of David Escamilla 9-10. My colleagues are surely right that this testimony could support a conclusion that Anglos do not control CD 25, but it doesn’t tell us anything more. The testimony of Dukes and Escamilla simply doesn’t address the critical issue: do minority voters in Travis County play some role beyond providing votes necessary to win? Minority voters may have veto power in Travis County, but the same is true whenever a minority group, however small, consistently provides the margin of victory.
Neither do the expert analysis nor statistical data show that CD 25 is a protected district.[5] My colleagues place much weight on the Travis County primary election results analyzed by Dr. Ansolabehere. But as noted above, Travis County is not CD 25. Travis County contains only 59.7% of CD 25’s population, even though it has a larger portion (66%) of the district’s minority population. See Pl.’s Ex. 11, at 7. The remaining 40.3% of CD 25 — which votes Republican — does not figure into Dr. Ansolabehere’s calculations at all.[6] Even *194 more troubling, over half of Travis County-lies outside CD 25, but is nonetheless included in the analysis. Id. Dr. Ansolabehere’s data set is thus both over- and under-inclusive in the extreme. This is particularly problematic because we have been provided with no explanation why it is appropriate to draw conclusions about CD 25 from voting data drawn from only a subset of the relevant population together with voters from a different district entirely.[7] This is not the type of “more exacting evidence” necessary to prove a crossover district. We must consider the district’s ability status, not Travis County’s.
Even assuming Travis County can stand in for CD 25, this primary data still does not show that minority voters themselves have an ability to elect in the district. Dr. Ansolabehere’s report shows that the Anglo-preferred candidate won only one primary without support from the Hispanic and Black communities in the contests he analyzed, but that the Hispanic- and Black-preferred candidates won twelve elections without Anglo support. And the vast majority of the time — in 31 out of 43 primaries — the prevailing candidate had support from the Black, Hispanic, and Anglo communities. More importantly, the conclusion he drew from this evidence is only that “[pjower is shared very equally” in Travis County, Defs.’ Ex. 724, Expert Witness Report of Dr. Stephen Ansolabehere 105-06 [hereinafter Ansolabehere Rep.], not that minorities lead the way. At best, this shows that all members of the coalition play a vital role at the primary level in Travis County. Even taking this conclusion as true, evidence that power is shared equally does not show that minority voters are at the helm, and thus that they themselves have an ability to elect in CD 25.
The final piece of evidence my colleagues marshal — and the only one that concerns CD 25 as a whole — is also from Dr. Ansolabehere. His report considers the breakdown of votes by racial and ethnic group for Representative Lloyd Doggett, the minority candidate of choice in CD 25. Even taking Dr. Ansolabehere’s calculations as accurate,[8] this evidence is *195 still insufficient to conclude that CD 25 is a crossover district. Dr. Ansolabehere calculates that Doggett won in 2008 with 53% of the Anglo vote, 83% of the Hispanic vote, and 100% of the Black vote in CD 25. Ansolabehere Rep. attach. 3. In 2010, he calculates that Doggett won with 37% of the Anglo vote, 86% of the Hispanic vote, and the entire Black vote. Id. At first blush, this seems persuasive. With the support of a little more than one-third to one-half of the Anglo vote, Rep. Doggett’s victories seem attributable to a minority community doing the heavy lifting. But Dr. Ansolabehere’s analysis begs the question, because it tells us nothing about voter turnout. Without that crucial element, there is no way to put his analysis into context. See Texas, 831 F.Supp.2d at 263 (“However, when there is no supermajority in a district, a Section 5 analysis must go beyond mere population data to include factors such as minority voter registration, minority voter turnout, election history, and minority/majority voting behaviors.” (emphasis added)). In other words, Dr. Ansolabehere does not answer the question, “83% and 86% of how many Hispanic voters, and 100% of how many Black voters? ” That minorities voted overwhelmingly for Rep. Doggett tells us very little about their role in the coalition. This data could support a story in which minorities lead the way to victory, but it could also tell a story in which minority voters have an equal voice to Anglos, or even one where Anglo voters take the lead in CD 25. Incomplete data from which we might infer ability status is not the type of “more exacting evidence” necessary to find a protected district.
Even taking Dr. Ansolabehere’s data at face value — a limb on which I am extremely loathe to perch for the reasons stated above — and using it to try to extrapolate the missing turnout data[9] would indicate that Anglos cast an average of 81% of all votes in CD 25 in 2008 and 2010, and thus that minorities cast only 19%.[10] Absent any indication that minorities play a leadership role in the coalition, I cannot conclude that a district where (according to the most favorable reading of expert testimony) minorities cast only 19% of the votes can be protected.
*196 This reading of Dr. Ansolabehere’s data is also largely consistent with the OAG voter turnout statistics my colleagues discard.[11] In the 2008 election, the OAG analysis indicates that minorities comprised approximately 18% of voters, almost exactly the 19% composition Dr. Ansolabehere appears to predict. Pl.’s Ex. 24, at 579. In 2010, the OAG data indicates voter turnout of 10%, which is lower than Dr. Ansolabehere’s apparent, average prediction of 19%, but not absurdly so. Id. The rest of the OAG data indicates that minorities cast closer to 10% of the vote in CD 25, Pl.’s Ex. 24, at 579-80. This data indicates that CD 25 looks much like the hypothetical district we described before in *197 which the Anglo voters that made up 90% of the district split their vote evenly and minority voters comprise just 10% of the votes, providing the margin of victory. We agreed that such a district would not be protected. Majority Op. at 150-51. Even assuming that minorities cast 19% of the vote, as Dr. Ansolabehere’s data appears to indicate, this would be enough only to show influence, not that benchmark CD 25 is a district in which minority voters themselves have an ability to elect.[12]
In sum, we heard testimony and received expert reports that minorities are essential to victory in Travis County, but that is not enough to find that CD 25 is a protected crossover district. To protect CD 25, we must find that minorities themselves have an ability to elect in CD 25— that they lead the coalition there. It is not enough that they provide the margin of victory in a competitive Democratic district. Most of the evidence concerns Travis County alone. No evidence includes turnout data, in Travis County or in the district as a whole. At best, the evidence shows that minorities cast no more than 20% of the votes in CD 25, and possibly significantly less. If this is the “more exacting” evidence we require to prove the existence of a coalition district, it is hard to see what Democratic district in Texas would not be so protected. Respectfully, I dissent from my colleagues’ assessment that benchmark CD 25 is an ability district.
APPENDIX TO THE MEMORANDUM OPINION
FINDINGS OF FACT & CONCLUSIONS OF LAW REGARDING DISPUTED ABILITY DISTRICTS
Collyer & Howell, District Judges:
I.THE CONGRESSIONAL PLAN
A. Congressional Redistricting Plan, C185
1. In 2006, a three-judge district court adopted a redistricting plan for the Texas congressional delegation. See LULAC v. Perry, 457 F.Supp.2d 716, 716-18 (E.D.Tex.2006) (per curiam). That plan, known as C 100, is the Benchmark Plan for the purposes of this case.
2. The 2010 Census showed that the population of Texas increased by 4,293,741, from 20,851,820 in 2000 to 25,145,561 in 2010. Pl.’s Ex. 75. This growth represented a 20.6% increase in the State’s overall population, with 89.2% of the increase attributable to growth in the minority populations. Mot. for Judicial Notice, ECF No. 180, ¶¶ 8, 18. Hispanics comprise 65% of the increase and Blacks comprise 13.4%. Id. at ¶¶ 20, 22.
3. As a result of this population growth, Texas was entitled to four new seats in the U.S. House of Representatives, increasing the State’s number of representatives from 32 to 36 members. This increase required the State to reallocate congressional districts, and necessitated the drawing of new district maps to govern congressional elections in 2012.
B. The Legislative Process
a. 2010 Field Hearings
4. Anticipating that the State’s population growth would result in additional congressional districts, in 2010, prior to the start of the 2011 legislative session, the Texas House Committee on Redistricting, the Texas House Judiciary Committee, and the Texas Senate Select Committee on Re *198 districting jointly or separately held approximately 19 field hearings around the State regarding the redistricting process for the State Legislature and congressional plans. Defs.’ Ex. 320, at 58-60 (Rep. of Dr. Arrington); Trial Tr. 86, Jan. 17, 2012 AM (Rep. Todd Hunter); Pl.’s Ex. 39; PL’s Ex. 42. The purpose of the hearings was to receive input before the formal redistricting process began in 2011. Trial Tr. 54, Jan. 17, 2012 AM (Rep. Hunter); Trial Tr. 145, Jan. 17, 2012 PM (Doug Davis).
5.At the time of these hearings, the official 2010 Census data had not yet been released, nor had any of the State legislative committees participating in the hearings furnished for public comment any proposed Congressional redistricting plans. Trial Tr. 115-16, Jan. 17, 2012 AM (Rep. Hunter). Testimony was presented at the hearings regarding the need to retain minority communities of interest, recognize minority population growth in the Dallas-Fort Worth metroplex with a new minority ability district, and maintain those congressional districts where minority voters had been able to elect their candidates of choice. See, e.g., Trial Tr. 10-11, Jan. 23, 2012 PM (Congresswoman Jackson Lee). Nevertheless, these hearings were of limited utility since no plans were available for the witnesses to review or to offer specific comment on. Furthermore, the sponsoring legislative committees prepared no written reports summarizing the information presented at the hearings to facilitate communication of any concerns or recommendations raised to members of the legislature who were not present. Trial Tr. 115, Jan. 17,'2012 AM (Rep. Hunter).[1]
6. Testimony at trial made clear that minority elected representatives from Texas viewed the 2010 field hearings as a “sham” or “just for show.” Trial Tr. 91, Jan. 19, 2012 AM (Rep. Dawnna Dukes) (testifying that the 2010 field hearings were “just a circus to show that a hearing had been held around the state, but it was not of substance because there was absolutely nothing before the committee for individuals to testify on, for or against.”); Defs.’ Ex. 809, at 4 (Senator Judith Zaffirini, Hispanic representative for SD 21, describing the 2010 field hearings as “a sham” with “low attendance, [ ] low participation, [ ] lack of invited testimony, [and] the lack of prepared materials for [members of the Senate Redistricting Committee].”); see also Trial Tr. 94, Jan. 20, 2012 AM (Sen. Rodney Ellis testifying that the 2010 field hearings were “perfunctory”).
7. In addition, the only Black member of the House Redistricting Committee, Representative Marc Veasey, testified that some field hearings, specifically in the Dallas-Fort Worth metroplex, were held in locations inconvenient for minority voters that did not have public transport, which limited their participation. Trial Tr. 8-12, Jan. 18, 2012 PM (Rep. Veasey). Representative Veasey offered to help find locations convenient for minority voters, but ultimately locations were picked without regard to the concerns of minority members of the redistricting committee. Id. at 12 (“But when it came to, you know, trying to make sure that you know, southeast Ft. Worth and the city of Ft. Worth, which, like I said, is the third largest concentration of African-Americans in the state — • trying to find a place to do hearings there, that no one came to consult with me or any other minority members of the committee. They just decided they were going to have *199 this field hearing in Arlington, which just, you know, still to this day makes no sense at all.”).
8. No evidence was presented that the 2010 field hearings addressed the topics of the number of districts that provided minority citizens the ability to elect the candidates of their choice or the minimal number of minority ability districts required for compliance with the Voting Rights Act (“VRA”) under any new congressional plan. See generally PL’s Ex. 50 (Texas Legislative Council Redistricting Guidance, dated August 2011, stating that courts generally compared the number of minority districts in the benchmark plan and in the enacted plan).
b. 2011 Regular Texas Legislative Session
9. After convening in January 2011, the Texas Legislature faced the task of enacting redistricting maps for the State House of Representatives (“State House”), State Senate, and U.S. House of Representatives in response to the population growth in the state. Trial Tr. 59-60, Jan. 18, 2012 AM (Downton). The regular session of the Texas Legislature ran from January 11 through May 30, 2011. Joint Stipulation, ECF No. 177, ¶¶ 3^1. No congressional redistricting plan was publicly released by the Redistricting Committees of either the State House or State Senate, nor were any hearings held concerning a congressional plan during the regular session.[2] Defs.’ Ex. 509, at 29-32; Joint Stipulation, ¶¶ 4-5.
10. During the Legislature’s regular session, only informal discussions were held concerning the congressional redistricting plan. Interested advocacy groups, including the Mexican American Legal Defense and Educational Fund (“MALDEF”) and Mexican American Legislative Caucus (“MALC”), proposed congressional maps to the House Redistricting Committee. Trial Tr. 60-61, Jan. 18, 2012 AM (Ryan Downton). Members of Texas’s congressional delegation also submitted proposals and attempted to meet with State legislators to discuss proposed plans.
c. 2011 Special Legislative Session
11. The Legislature’s failure to enact a new congressional plan during the regular session prompted Governor Rick Perry, on May 31, 2011, to order the State Legislature to sit in Special Session to address, among other things, legislation relating to congressional redistricting. Joint Stipulation, ¶5. On the first day of this special session, on May 31, 2011, Chairman Kel Seliger, chairman of the Senate Redistricting Committee, and Chairman Burt Solomons, chairman of House Redistricting Committee, publicly released C125, which was the first congressional redistricting plan proposed publicly by the leadership of the State Legislature. Defs.’ Ex. 366.
12. Hispanic and Black members of the State House were not included in the map-drawing process for C125. State Representative Marc Veasey, a Black member of the House Redistricting Committee, testified that no minority state representative had any input into the proposed congressional redistricting map before it was made public. Defs.’ Ex. 335 (Veasey Dep. at 25-27, Aug. 19, 2011); see also Trial Tr. 91-93, Jan. 19, 2012 PM (Rep. Dukes) (testifying that she first saw the proposed congressional map on Friday, June 9, 2011 well after its release).[3]
*200 13. In the late afternoon of May 31, 2011, the State House and Senate noticed public hearings on C125. Less than 48 hours later, at 9:00 a.m. on June 2, 2011, the House Redistricting Committee held its only public hearing on the proposed plan at the State Capitol in Austin. The following day, on Friday, June 3, 2011, the Senate Redistricting Committee held its only hearing on C125, also in the State Capitol in Austin. Defs.’ Ex. 320, at 59 (Rep. of Dr. Arrington); Defs.’ Ex. 366 (Congressional Redistricting Timeline); Defs.’ Ex. 509, at 39.
14. At the June 3, 2011 Senate Redistricting Committee hearing, minority members of the Committee complained of being excluded from the congressional redistricting process. Defs.’ Ex. 370 at 1. Specifically, Senator Judith Zaffirini, a Hispanic Senator representing SD 21, and Senator Royce West, a Black Senator representing SD 23, complained that the process was too rushed and stated that neither they nor the public had adequate time to study the proposed map or meaningfully participate. Id. Senator West stated: “For the purposes of the record, I did not have any input into the map 125. I never saw map 125 before you published it.” Id. Similarly, Senator Zaffirini told Chairman Seliger: “I’ve been on every redistricting committee since my election in 1986 and I must say that I have never had less input into the drawing of any map until this session.” Id.
15. Experts retained by the Senate Redistricting Committee from Baylor University’s School of Law and the University of Texas Law School, Professors David Guinn, Mike Morrison, and Robert Heath (“Senate Redistricting Committee Outside Experts”), echoed concerns about the lack of opportunity for public scrutiny of C125 in comparison to redistricting processes in previous years. Trial Tr. 73, 81, Jan. 24, 2012 AM, (Chairman Seliger); Defs.’ Ex. 370, at 2. These outside experts indicated that they did not have an opportunity to review the proposed congressional redistricting plan before it was presented in the Committee hearing. Defs.’ Ex. 370, at 2; Defs.’ Ex. 568, at 1. Professor Morrison testified that “this process has been quite different from what we’ve seen in the past ... [n]obody has had the opportunity to study it the way it has been done in the past.” Id. He explained further that this procedure differed from the one followed in 2003 when the committee’s staff “went all over the state ... spent sixteen hours in one place, twenty in another. We sat down ... we visited. We hired experts to do retrogression analysis.” Id. In fact, evidence presented at trial shows, for example, that prior to passage of the congressional redistricting plan in 2003, the Redistricting Committees held seven public hearings, and the committee substitute bill was the focus of six of those hearings. Defs.’ Ex. 300.
16.At the June 3, 2011 hearing, the Senate Redistricting Committee Outside Experts cautioned Members about the care required for compliance with the VRA, testifying that they “furnished the committee an advisement to take [the DOJ 2011 Guidelines] and read them all very carefully.” Defs.’ Ex. 370. Indeed, Chairman Seliger testified that the sole responsibility of these outside counsel was “to vet the maps as we drew them and to inform me or anyone else on the committee whether they were legal or not.” Trial Tr. 81, Jan. 24, 2012 AM (Chairman Seliger). In his pre-filed written direct testimony, Chairman Seliger claimed that he relied on these experts to “inform me if the demographies, performance, or any other attribute of a proposed district would raise con *201 cerns under the Voting Rights Act.” Pl.’s Ex. 162, ¶ 4 (Seliger Pre-filed Direct Testimony). To the contrary, these experts testified before the Senate Redistricting Committee that they did not “provide[] verbal or written guidance or [ Jopinion to the committee regarding whether [the proposed Congressional plans were] in compliance with Section 5” because they were not asked to do so. Defs.’ Ex. 370, at 3.
17. On June 6, 2011, the Monday immediately following the Friday hearing, the full Senate considered the proposed congressional redistricting plan, C185 (the “Congressional Plan”). On the floor of the Senate, Senator Zaffirini asked Chairman Seliger if “any minority Members [were] involved in developing” the redistricting maps under consideration. Chairman Seliger bluntly responded, “[n]ot that I recall.” Devaney Deck, ECF No. 77, Ex. 9 (Texas State Senate Journal, June 6, 2011, at A-12). Chairman Seliger also admitted during the floor debate that the Senate Redistricting Committee Outside Experts he hired had not seen the Congressional Plan until it was released in committee and that these outside experts had not evaluated the plan for compliance with the VRA. Defs.’ Ex. 568 at 1. Nevertheless, the Senate passed the proposed Congressional Plan in Senate Bill 4 (“SB4”) on June 6, 2011 by a party-line vote of 18-12. Joint Stipulation, ¶¶ 16-17,19.
18. Following passage of SB4, the State House leadership gave notice that the House Redistricting Committee would meet to consider the Senate Bill at 9:00 a.m. on June 9, 2011. On June 9, 2011, the House Redistricting Committee met to consider the proposed Congressional Plan, and passed it out of Committee without taking any public comments. Defs.’ Ex. 320, at 59 (Rep. of Dr. Arrington); Defs.’ Ex. 366. Representative Dukes, who is not on the House Redistricting Committee, testified that she first saw the proposed Congressional Plan on June 9, 2011. Trial Tr. 91-93, Jan. 19, 2012 PM (Rep. Dukes). That same day, the State House passed a Calendar Rule requiring any amendments to the proposed map to be filed “prior to Monday.” Id. This effectively gave any representative two days to prepare and submit proposed alterations to the congressional map. Representative Dukes testified that she worked through the weekend on an amendment and proposed a new map, but Chairman Solomons tabled her amendment and it was never considered. Trial Tr. 93-94, Jan. 19, 2012 AM (Rep. Dukes). State Representative Dukes further testified that every Democratic proposal to amend C185 was tabled. Id.
19. On June 15, 2011, the State House passed the proposed Congressional Plan by a vote of 93^47-3,[4] after incorporating minor amendments. Joint Stipulation, ¶¶ 16-17. All Democratic members of the State House voted against passage of SB4. Texas State House Journal, June 15, 2011, at 421. The State Senate concurred with the State House amendments to the proposed Congressional Plan on June 20, 2011, and SB4 was reported as enrolled on June 20, 2011. SB4 was then signed by the State Senate on June 22, 2011, and the State House on June 24, 2011. Joint Stipulation, ¶ 16. On June 24, 2011, SB4 containing the proposed congressional map, C185, was transmitted to Governor Rick Perry, who signed it into law three weeks later, on July 18, 2011. Id.
20. The legislative process under which the Congressional Plan was made public, *202 considered and enacted was rapid. The timing of the two public hearings in the House and Senate Redistricting Committees within the short span of 48 and 72 hours, respectively, after first public release of the Congressional Plan severely circumscribed the opportunity for meaningful public scrutiny and comment, including by minority citizens and their elected officials. Defs.’ Ex. 320, at 58-60 (Rep. of Dr. Arrington); Trial Tr. 16, Jan. 18, 2012 PM (Rep. Veasey). Outreach by Representative Todd Hunter, Chair of the House Judiciary Committee, to the congressional delegation during a 2010 visit to Washington, D.C., and by Congresswoman Sheila Jackson Lee and Congressman Gene Green to Chairman Solomons in 2011, appear to have been “meet and greet” sessions with minimal to no substantive discussion about the changes planned by the Texas legislators to the districts represented by minority Members of Congress. PL’s Ex. 162, ¶ 12 (Chairman Seliger PreFiled Direct Testimony); PL’s Ex. 148, ¶ 8 (Chairman Solomons Pre-Filed Direct Testimony) (stating that the meetings with Congressman Green and Congresswoman Jackson Lee were “more of a ‘meet and greet,’ neither of the congresspersons provided me with any details requesting specific changes to their districts”).
C. Mapdrawers’ View of the Redistricting Process
21. Ryan Downton, the general counsel to the House Committee on Redistricting under Chairman Burt Solomons, was the principal drafter of the Congressional Plan. Trial Tr. 44-45, Jan. 18, 2012 AM (Downton); Trial Tr. 47, Jan. 17, 2012 PM (Interiano). Mr. Downton was primarily responsible for “zeroing-out”[5] districts to make them conform to the required population size and for allocating Texas’s four new congressional districts. Gerardo Interiano, counsel to Speaker of the State House Joe Straus, also testified that he periodically helped Mr. Downton with the congressional map to zero-out population deviations. Trial Tr. 105, Jan. 17, 2012 PM (Interiano); Trial Tr. 44-45, Jan. 18, 2012 AM (Downton); Trial Tr. 47, Jan. 17, 2012 PM (Interiano).
22. Upon release of the 2010 Census data on February 17, 2011, Mr. Downton testified that he learned that “there were three areas where the population growth per region significantly outpaced growth in the rest of the state. Those three regions, the first being north central Texas around the Dallas-Fort Worth metroplex. The second being the suburban areas around Harris County in kind of Southeast Texas, and the third being the 1-35 corridor running from San Antonio north through Austin.” Trial Tr. 61-62, Jan. 18, 2012 AM (Downton).[6] Mr. Downton believed that of the four new congressional seats allotted to Texas, “one had to go in each of those regions and in the fourth one [Texas] had some flexibility.” Id. at 62.
*203 28. Prior to assignment of map-drawing responsibilities, Mr. Downton was aware of the VRA and actively sought to educate himself on its requirements. Trial Tr. 45, Jan. 18, 2012 AM (Downton). To this end, Mr. Downton consulted with the Texas Legislative Council[7] (“TLC”), including a lawyer named David Hanna. See id. at 50. Mr. Downton testified that he viewed compliance with the VRA on par in importance with getting enough votes to get the map passed, but this testimony is not credible. Defs.’ Ex. 778A (Downton Dep. 62, Aug. 12, 2011).
24.Mr. Downton testified that during the map-drawing process he identified districts protected by the VRA in the Benchmark Plan “based on Census level. If they were above 50%, then they were Hispanic majority districts.” Trial Tr. 63, Jan. 18, 2012 AM (Downton). The specific demographic statistics that Mr. Downton relied upon were Hispanic Citizen Voting Age Population (“HCVAP”) and Spanish Surname Voter Registration (“SSVR”). Defs.’ Ex. 778A (Downton Dep. 22, Aug. 12, 2011); Trial Tr. 67, Jan. 18, 2012 AM (Downton). If these statistics were above the 50% mark, he believed the district was protected under the VRA. Defs.’ Ex. 577 (Trial Tr. 966, Perez v. Perry, civil action no. SA:11-360 (W.D.Tex. Sept. 9, 2011)). Based on Census data alone, Mr. Downton identified seven districts (CDs 15, 16, 20, 23, 27, 28 and 29) as protected districts in the Benchmark Plan that provided Hispanic citizens the ability to elect their candidates of choice.[8] Trial Tr. 63-65, Jan. 18, 2012 AM (Downton)
25. The Office of the Attorney General (the “OAG”) performed a racially polarized voting analysis of the Benchmark and enacted districts. PL’s Ex. 26, 27.
26. The OAG also performed reconstituted election analyses that estimated what percentage of a specific racial or language-minority group voted for certain candidates in chosen primary and general elections. PL’s Ex. 27. These analyses were based on ten general elections (the “OAG 10”) selected by Todd Giberson, an employee in the OAG’s Legal Technical Support Division, because they were “racially contested elections,” i.e., ones that involved minority candidates running against each other or a minority candidate running against a non-minority candidate. Giberson Dep. 16, 20-21, Oct. 18, 2011.
27. Mr. Interiano, who assisted in drawing the Congressional Plan, confirmed that any initial understanding of protected districts in the Benchmark Plan was made solely by looking at the demographic population statistics of the district. Trial Tr. 26-27, 47-48, Jan. 17, 2012 PM (Interiano). He testified that the mapdrawers did not look at election result analyses for the Benchmark Plan to help identify protected districts until they had already submitted draft redistricting plans to the OAG. Id. Mr. Downton was also clear that he did not factor the State’s reconstituted election analysis into his determination of whether a district was a Hispanic majority district and therefore a protected district in the Benchmark Plan. Defs.’ Ex. 778A (Down-ton Dep. 22-23, Aug. 12, 2011). In his view, political performance was not partic *204 ularly relevant. Id. at 24. If a district met the mapdrawers’ own standard of over 50% in HCVAP and SSVR, he classified the district as an ability district regardless of whether it elected the minority candidate of choice 3 out of 10 times, or 1 out of 10 times. Id. at 24-25; Defs.’ Ex. 577 (Trial Tr. 966, Perez v. Perry, Sept. 9, 2011 (Downton)). Mr. Interiano also testified that demographic information, including Hispanic Voting Age Population (“HVAP”), HCVAP and SSVR, must be considered to determine if a district is a Hispanic “opportunity” district. Defs.’ Ex. 579 (Trial Tr. 1451, Perez v. Perry, Sept. 12, 2011 (Interiano)). Mr. Hanna advised the mapdrawers, however, that even if a district were over a 51% threshold based upon demographic data, it might not perform for the minority population. See Defs.’ Ex. 305; Defs.’ Ex. 312, at 5 (when editing Texas’s informal preclearance submission to the DOJ, Mr. Hanna commented that demographic benchmarks were “phony”).
28.Mr. Downton ignored Mr. Hanna’s advice about identifying minority ability districts. Relying solely on demographic statistics to identify a minority population’s ability to elect, Mr. Downton testified that when drawing the Congressional Plan, he tried to keep the demographic numbers of protected districts “at then-benchmark levels.” Trial Tr. 65-66, Jan. 18, 2012 AM (Downton). The Congressional Plan was legally compliant with the VRA, in his opinion, because seven districts in South and Central Texas have over 50% HCVAP. Defs.’ Ex. 577 (Trial Tr. 950, Perez v. Perry, Sept. 9, 2011 (Downton)). Mr. Downton asserted, however, that based on the reconstituted election analysis conducted after the Congressional Plan was submitted to the OAG, in his view, the Congressional Plan actually increases the number of districts that provide Hispanics the ability to elect then-candidate of choice. Trial Tr. 67-68, Jan. 18, 2012 AM (Downton).
29. Messrs. Downton and Interiano both testified that they did not look at reconstituted election analyses or performance prior to completing the Congressional Plan, even though they both received legal advice that, for VRA compliance, reliance solely on demographic data is insufficient to measure the number of protected districts in the benchmark or the enacted plan. Trial Tr. 1451-52, Perez v. Perry, Sept. 12, 2011 (Interiano); Trial Tr. 57, Jan. 18, 2012 AM (Downton).
30. While the mapdrawers’ reliance solely on demographic data to assess VRA compliance was erroneous, their superiors were negligent of their responsibilities under the VRA. The Chairmen of the Redistricting Committees testified that they relied on the mapdrawers to ensure that the map was “legal,” but made little independent effort to ensure that minority districts were protected. Chairman Solomons did not utilize the Senate Redistricting Committee Outside Experts hired to evaluate whether the Congressional Plan complied with the VRA. Neither he nor Chairman Seliger ever asked for the specific number of minority ability districts required, at a minimum, to ensure that the congressional map complied with the VRA. Trial Tr. 11, Jan. 24, 2012 AM (Chairman Seliger); Trial Tr. 65-67, Jan. 20, 2012 PM (Chairman Solomons testifying that he did not know or identify the number of protected districts in the Benchmark Plan because that determination was made by his staff).
*205 D. Congressional Districts at Issue
a. Congressional District 23
31. In the Benchmark Plan, CD 23 is based in West Texas and incorporates Brewster, Crockett, Culberson, Dimmit, Edwards, Hudspeth, Jeff Davis, Kinney, Maverick, Medina, Pecos, Presido, Reeves, Terrel, Uvalde, Val Verde, and Zavala counties, as well as portions of Bexar, El Paso, and Sutton counties. PL’s Ex. 11, at 5-6. In terms of metropolitan areas, CD 23 in the Benchmark Plan includes the cities of Del Rio and Eagle Pass, as well as areas of Bexar County that fall outside San Antonio’s city limits. This district was drawn in 2006, following the Supreme Court’s ruling in LULAC v. Perry, by the U.S. District Court for the Eastern District of Texas in order to remedy the State’s violation of Section 2 of the VRA and provide Hispanics the opportunity to elect candidates of their choice. Defs.’ Ex. 826, at 5 (Rep. of Dr. Flores); Defs.’ Ex. 575 (Trial Tr. 300, Perez v. Perry, Sept. 7, 2011 (Flores)).
32. Based on demographic statistics, Hispanics are a clear majority of the population in the Benchmark CD 23 and endogenous election results indicate that the district often elected a Hispanic candidate of choice, even if not every time. See infra ¶ 35.
33. The only expert proffered by Texas on the issue of retrogression disagrees with Texas and concludes that CD 23 is no longer an ability district. Defs.’ Ex. 581 (Trial Tr. 1839, Perez v. Perry, Sept. 14, 2011) (Dr. Alford testifying: “I don’t think that the 23rd is any more likely to perform that it was. I think it is probably less likely to perform than it was, and so I certainly wouldn’t count and don’t — in all of this discussion, I haven’t counted the 23rd as an effective minority district in the newly adopted plan, but it does remain a majority district.”) (emphases added).
34. CD 23 in the Congressional Plan is no longer an ability district.
i. Demographic and Election Result Data for Benchmark Congressional District 23
35. Texas has identified CD 23 as a Hispanic ability district in the Benchmark. See PL’s Mem. Supp. Mot. Summ. J., ECF No. 41, at 6. In the Benchmark Plan, CD 23 has an overall Hispanic population of 66.4%, an HCVAP of 58.4%, and an SSVR of 52.6%. PL’s Ex. 11, at 10. According to the OAG’s election analysis, Hispanic citizens in Benchmark CD 23 elected their candidate of choice in three out of ten elections. Defs.’ Ex. 390. The Texas Latino Redistricting Task Force (“TLRTF”) argues that the OAG 10 does not accurately reflect the ability of Hispanics to perform in the district. If four additional racially contested elections are examined, the Hispanic candidate of choice wins in 7 out of 14 elections. Trial Tr. 111-13, Jan. 18, 2012 AM (Downton); Defs.’ Ex. 647. Moreover, Dr. Richard Engstrom, an expert offered by TLRTF, emphasizes that from 2006 to 2010, the candidate of choice of Hispanics won two of three endogenous elections in Benchmark CD 23. Defs.’ Ex. 575 (Trial Tr. 513-14, Perez v. Perry, Sept. 7, 2011) (Engstrom).
36. Mr. Interiano testified that prior to redrawing CD 23, he never made a determination as to whether CD 23 was a protected district in the Benchmark Plan. Trial Tr. 49, Jan. 17, 2012 PM (Interiano). Chairman Seliger, however, testified that in the Benchmark Plan CD 23 is a Hispanic “opportunity” district and was drawn to be a Hispanic “opportunity” district by the court. Defs.’ Ex. 776 (Seliger Dep. 13, Sept. 1, 2011). The State’s expert witness, *206 Dr. Alford, similarly testified that since the creation of CD 23 in 2006, it elected the Hispanic-preferred candidate in 2006 and 2008. Defs.’ Ex. 964 (Alford Dep. 121, Sept. 2, 2011).
37. CD 23 is currently represented by Congressman Francisco Canseco, a Hispanic Republican. Defs.’ Ex. 406, at 7. Congressman Canseco was first elected to office in the 2010 election, in which he defeated incumbent Ciro D. Rodriguez, a Hispanic Democrat, by a vote of 74,853 to 67,348, or 49.39% to 44.44%. Pl.’s Ex. 32, at 13. Voting in the 2010 election was racially polarized, with 84.7% of Hispanics voting for Mr. Rodriguez. Defs.’ Ex. 728, at 25 (Rep. of Dr. Engstrom). While Hispanics overwhelmingly supported Mr. Rodriguez, he received only 18.1% of votes cast by non-Hispanics. Id.
38. The evidence presented demonstrates that Congressman Canseco won a close election for CD 23 in 2010. With regards to this election, and others during 2010, Chairman Seliger testified that “the 2010 election was a bit of an aberration because of things like the Tea Party influence and I didn’t know if it was reliable.” Defs.’ Ex. 776 (Seliger Dep. 15, Sept. 1, 2011); Trial Tr. 11, Jan. 24, 2012 AM (Chairman Seliger).
39. Although Chairman Seliger acknowledged that the 2010 election may not be “reliable,” he expressed his belief that Congressman Canseco was the preferred candidate of Hispanics in CD 23. Defs.’ Ex. 776 (Seliger Dep. 15, Sept. 1, 2011); Trial Tr. 11, Jan. 24, 2012 AM (Chairman Seliger). He conceded that his belief is not based upon any analysis to determine whether Congressman Canseco was in fact the Hispanic candidate of choice. Defs.’ Ex. 776 (Seliger Dep. 31, Sept. 1, 2011). Furthermore, despite his stated belief that Congressman Canseco was the Hispanic candidate of choice in a Hispanic district, Chairman Seliger testified that he wanted to change CD 23 to make it safer for Congressman Canseco. Id. at 14; Trial Tr. 11, Jan. 24, 2012 AM (Chairman Seliger). Indeed, he testified that it was possible that Congressman Canseco would lose in 2012 if CD 23 were not reconfigured in some way. Defs.’ Ex. 776 (Seliger Dep. 15, Sept. 1, 2011); Trial Tr. 11-12, Jan. 24, 2012 AM (Chairman Seliger). Notwithstanding his desire to improve Congressman Canseco’s electoral performance, Chairman Seliger testified that he stressed to staff that CD 23 needed to remain a Hispanic district. Defs.’ Ex. 776 (Seliger Dep. 13, 15, 30, 37, Sept. 1, 2011). He believed that the Legislature was legally required to build a district to elect the Hispanic candidate of choice in CD 23. Id. at 31; Trial Tr. 14-16, Jan. 24, 2012 AM (Chairman Seliger). Chairman Seliger further testified that if he had understood that Congressman Canseco was not the Hispanic preferred candidate, and he was taking steps to make CD 23 safer for Congressman Canseco, that would have created a concern in his mind regarding compliance with the VRA. Trial Tr. 11-16, Jan. 24, 2012 AM (Chairman Seliger).
ii. Plan to Protect Congressman Canseco
40.The Senate Redistricting Committee staff attempted to draw a district safe for Congressman Canseco’s reelection but found this to be a difficult challenge. Chairman Seliger stated: “in order to keep it as an opportunity district we just couldn’t piece it together where it served Congressman Canseco; and we wanted to if we could. And then [the House] came up with their design and we thought it was good.” Defs.’ Ex. 776 (Seliger Dep. 14, Sept. 1, 2011).
*207 41. The mapdrawers in the State House, Messrs. Downton and Interiano, testified that there were “two goals” with regard to CD 23 when drawing the enacted map: “to maintain or strengthen the Hispanic nature of 23 and also strengthen the [Republican nature of 23.” Trial Tr. 80, Jan. 18, 2012 AM (Mr. Downton); Trial Tr. 47, Jan. 17, 2012 PM (Interiano); Defs.’ Ex. 579 (Trial Tr. 1454-55, Perez v. Perry, Sept. 12, 2011 (Interiano)); Defs.’ Ex. 779A (Interiano Dep. 102, Aug. 2, 2011). Mr. Interiano acknowledged, however, that he never conducted any analysis to determine if Congressman Canseco is the Hispanic preferred candidate in Benchmark CD 23. Defs.’ Ex. 579 (Trial Tr. 1456, Perez v. Perry, Sept. 12, 2011 (Interiano)); Defs.’ Ex. 779A (Interiano Dep. 86-87, Aug. 2, 2011); Trial Tr. 49, Jan. 17, 2012 PM (Interiano). Mr. Downton conceded that he knew when he was drawing CD 23 that Congressman Canseco was not the Hispanic candidate of choice. Defs.’ Ex. 577 (Trial Tr. 966, Perez v. Perry, Sept. 9, 2011 (Downton)); Defs.’ Ex. 778A (Downton Dep. 90, Aug. 12, 2011). He nonetheless drew CD 23 to “giv[e] Mr. C[a]nseco his best chance to be re-elected while maintaining and increasing the ... total ... Hispanic voting age, Hispanic citizen voting age, and Spanish surname voter registration.” Trial Tr. 105-107, Jan. 18, 2012 AM (Downton).
42. The mapdrawers were aware that because Congressman Canseco was not the minority candidate of choice, increasing CD 23’s performance for Congressman Canseco would be problematic. For example, on April 13, 2011, a staffer at the National Republican Congressional Committee, Lee Padilla, requested in an email that Doug Davis, Director for the Senate Select Committee on Redistricting, “check on the latest Canseco version.” Defs.’ Ex. 978. Mr. Davis responded that “[i]t looks nice politically. We’re still concerned about the Voting Rights Act.” Mr. Davis continued that “[w]e’re going to have to put our best legal minds on the 23rd.” Id.
43. During the map-drawing process, legislative staffers understood that drawing a map to protect Congressman Canseco while maintaining the benchmark demographic statistics would require careful uses of demographic statistics. As early in the redistricting process as November 2010, Eric Opiela[9] sent an email to Mr. Interiano, explaining that “certain data would be useful in identifying a nudge factor by which one can analyze which census blocks, when added to a particular district, especially 50-plus-l majority-minority districts, help pull the districts total Hispanic pop[ulation] and the Hispanic CVAP up to majority status, but leave the Spanish surnamed registered voters and turnout the lowest. This is especially valuable in shoring up Canseco and Farenthold.” Defs.’ Ex. 304; Trial Tr. 52-53, Jan. 17, 2012 PM (Interiano). According to Mr. Interiano, the import of this November 2010 email was to use demographic data, such as HVAP, HCVAP and SSVR, to draw a district that featured lower turnout of Spanish surname voters, while leaving the HCVAP at the benchmark level. Trial Tr. 53, Jan. 17, 2012 PM (Interiano).
44. Mr. Opiela was not an outsider to the redistricting process and played a role in the manner in which districts were drawn. Mr. Downton testified that he communicated with Mr. Opiela during the drawing of the Congressional Plan and *208 understood that the latter was “speaking on behalf of the Republican Congressmen from Texas with the exception of Representative Barton.” Trial Tr. 104, Jan. 18, 2012 AM (Downton); Trial Tr. 56, Jan. 17, 2012 PM (Interiano). Indeed, Mr. Down-ton acknowledged that he incorporated some of Mr. Opiela’s ideas into the Congressional Plan. Trial Tr. 104, Jan. 18, 2012 AM (Downton). Mr. Opiela also gave pointers to Mr. Interiano during the redistricting process. In particular, after Mr. Opiela informed Mr. Interiano in the November 2010 email that data available at the block level could be used to lower a district’s turnout of voters with Spanish surnames while raising its total Hispanic population, Messrs. Interiano and Opiela requested SSVR data at the block level from the TLC. Defs.’ Ex. 820; Defs.’ Ex. 980.
iii. Alterations to Congressional District 23 in the Congressional Plan
45. The 2010 Census indicated that CD 23 was overpopulated by about 149,000 people. Defs.’ Ex. 575 (Trial Tr. 450, Perez v. Perry, Sept. 7, 2011 (Flores)); Defs.’ Ex. 436. Mr. Downton testified that CD 23 was “a very sensitive district” throughout the redistricting process because “[i]t was previously a court drawn district. We wanted to make sure we maintained the SSVR and HCVAP level of District 23.” Trial Tr. 78, Jan. 18, 2012 AM (Downton). As noted above, Mr. Downton also wanted to improve the district’s performance for Congressman Canseco. Id. at 105.
46. Mr. Downton testified that while drawing CD 23 in the Congressional Plan he shaded precincts by election results and moved precincts in and out of CD 23 based on their election performance. Trial Tr. 107-08, Jan. 18, 2012 AM (Downton). In choosing between two precincts with similar SSVR, Mr. Downton testified that he would select the precinct with the greater percentage of Republican votes. Id. at 109. He did not, however, have any data showing which voters in a precinct were both Hispanic and Republican. Id. at 108. Mr. Downton sought to protect Congressman Canseco’s reelection prospects by including in CD 23 those precincts that voted for Senator John McCain in the 2008 Presidential election, even though he recognized the possibility that these precincts voted for Senator McCain because Anglo voters preferred Senator McCain and turned out at higher rates than Hispanic voters. Id. at 109-10; Defs.’ Ex. 577 (Trial Tr. 956, Perez v. Perry, Sept. 9, 2011 (Downton)); Defs.’ Ex. 778A (Downton Dep. 76-77, Aug. 12, 2011). Mr. Downton testified, however, that he “never looked at turnout data for any map.” Trial Tr. 89, Jan. 18, 2012 AM (Downton).
47. To address the overpopulation in CD 23 of approximately 149,000 people, mapdrawers moved over 600,000 residents in and out of the district. Defs.’ Ex. 575 (Trial Tr. 450, Perez v. Perry, Sept. 7, 2011 (Flores)); Defs.’ Ex. 436. The Congressional Plan adds approximately 33,000 people from traditionally Anglo counties along Benchmark CD 23’s northern border. Id. at 448; Defs.’ Ex. 430, at 1. Chairman Seliger testified that he did not know why some of these counties were added to CD 23 because it was done by his counterparts in the State House, but stated that no study was done in these counties to determine if the Republican primary voters would support a Hispanic candidate. Defs.’ Ex. 776 (Seliger Dep. 31, 36, Sept. 1, 2011); Trial Tr. 15, Jan. 24, 2012 AM (Seliger).
48. Instead of adding population from Anglo counties in the northern part of CD 23- — north of the Pecos river — Chairman *209 Seliger testified that the excess population in CD 23 could have been addressed by simply moving CD 23 down toward the border with Mexico, without extending the district northward. Defs.’ Ex. 776 (Seliger Dep. 38, Sept. 1, 2011); Trial Tr. 20-21, Jan. 24, 2012 AM (Seliger). Chairman Seliger acknowledged that if CD 23 were pulled down closer to the border, Hispanic voters would “determine[ ] the outcome” of the election in CD 23. Defs.’ Ex. 776 (Seliger Dep. 38, Sept. 1, 2011); Trial Tr. 20-21, Jan. 24, 2012 AM (Seliger). Mr. Downton similarly testified that because CD 23 lies adjacent to the border with Mexico and New Mexico, it is mathematically possible to achieve the ideal population in CD 23 by removing precincts from the northern and western part of the district. Defs.’ Ex. 778A (Downton Dep. 85, Aug. 12, 2011).
49. In addition to adding population from Anglo counties to the north of CD 23, over 300,000 people in Bexar County were moved out of, and about 60,000 individuals in Bexar County were moved into CD 23. Defs.’ Ex. 575 (Trial Tr. 485, Perez v. Perry, Sept. 7, 2011 (Flores)); Defs.’ Ex. 436.
50. At the same time that he attributed population shifts in CD 23 as furthering the goal of making the district safer for Congressman Canseco, Mr. Downton also testified that changes were made to CD 23 in Bexar County to accommodate requests by State Representative Jose Menendez and Congressman Charles Gonzales for CD 20 and CD 35, a new congressional district in the Bexar County area. Trial Tr. 78-79, Jan. 18, 2012 AM (Downton). These requests with respect to CD 23 in the San Antonio area, according to Mr. Downton, “dropped the HCVAP of [CD] 23 below the Court [drawn] level” and required “other changes to [CD] 23 in other parts of the map to try to bring it back up. So it was kind of a constant ripple between 20, 23, 35 and to a lesser extent 21, and it might be 15, and other districts coming into Bexar County to try to get all of that to work.” Id. In order to increase the HCVAP and SSVR of CD 23 to benchmark levels, Mr. Downton testified that he altered the boundary between CD 16 and CD 23 near El Paso County, and made changes to the “southern region” of CD 23. Id. at 81-83. Specifically, Mr. Downton testified that he split Maverick County at the southern end of enacted CD 23 and moved half of that County into enacted CD 28 in order to raise enacted CD 23’s HCVAP level. He did this, in part, because he did not want to split Webb County, given previous litigation regarding a split of Webb County in LULAC v. Perry. Id. at 83-84.
iv. The Splitting of Maverick County
51. In the Benchmark Plan, Maverick County, and its most populous city, Eagle Pass, are entirely contained in CD 23. Defs.’ Ex. 428, at 4. The Congressional Plan, however, moves half of Maverick County from CD 23, splitting the city of Eagle Pass between CD 23 and CD 28. Id.; Defs.’ Ex. 340, at 1; Defs.’ Ex. 575 (Trial Tr. 447, Perez v. Perry, Sept. 7, 2011 (Flores)); Defs.’ Ex. 430, at 1.
52. Maverick County is located along the Mexican border and is among the “poorest counties in the United States.” Trial Tr. 113, Jan. 18, 2012 PM (Saucedo). The County Judge for Maverick County, David Saucedo, testified that despite their relative poverty, “the citizens of Maverick County have been educated on the electoral process. They’re aware of the fact of the investments that are made in that district. They’re aware of the fact [of] the money that’s invested by candidates to run *210 in that district. And Maverick — the people in Maverick County understand that you can actually have a larger margin come [from] one community like Maverick County than you would in all of the San Antonio portion that is represented by that congressman. So that is what has given a community, a midsized community like ours, more influence.” Id. at 118. Judge Saucedo further testified that the Maverick County community is united and “[w]hen we go out, ... we vote for one candidate and we’ve finally seen some of that change come about. We’re fighting for four-year universities, we’re fighting for veterans climes, things that don’t exist in Maverick County that actually exist in smaller communities outside Maverick County.” Id. at 115.
53. The Congressional Plan splits Maverick County in half between enacted CD 23 and CD 28. Defs.’ Ex. 428, at 4; Defs.’ Ex. 340, at 1. During his testimony at trial, Mr. Downton could not remember how he split Maverick County, but believed “a large part of it follows the road ... it was essentially just cutting the county in half.” Trial Tr. 85, Jan. 18, 2012 AM (Downton). Mr. Downton later conceded, however, that the split of Maverick County in the enacted plan does not follow just one road and also resulted in at least three precinct cuts. Id. at 114; Defs.’ Ex. 575 (Trial Tr. 449, Perez v. Perry, Sept. 7, 2011 (Flores)).
54. Mr. Downton indicated that he was not aware that he cut the city of Eagle Pass in half when he split Maverick County. Trial Tr. 86, Jan. 18, 2012 AM (Down-ton). In any event, he appeared to discount the impact of this decision, stating his belief that “there’s roughly a thousand people that live there. So it didn’t change the nature of either district.” Id. The City of Eagle Pass actually has a population of 26,248 and is 95.5% Hispanic. Defs.’ Ex. 391, at 1012.
55. Mr. Downton testified that he removed portions of Maverick County from CD 23 because Maverick County does not have a good record of voting Republican. Defs.’ Ex. 577 (Trial Tr. 963, Perez v. Perry, Sept. 9, 2011 (Downton)); Defs.’ Ex. 778A (Downton Dep. 87-90, Aug. 12, 2011). In the 2010 general election, Ciro Rodriguez, the candidate of choice of Hispanics, won 80.29 % of the vote in Maverick County and Congressman Canseco won only 15.64 % of the vote. Defs.’ Ex. 393, at 3. In the 2010 Republican Primary Election, Congressman Canseco received only 23.07 % of the vote in Maverick County. Id. at 4. Judge Saucedo testified that for the past ten years Maverick County has turned out about 12,000 to 14,000 voters for presidential elections, and 8,000 to 9,000 voters in other elections, and they vote heavily for the Hispanic-preferred candidate. Defs.’ Ex. 576 (Trial Tr. 771, Perez v. Perry, Sept. 8, 2011 (Saucedo)); Defs.’ Ex. 576 (Trial Tr. 681, Perez v. Perry, Sept. 8, 2011 (Korbel)). Splitting Maverick County, according to Judge Saucedo, could make the difference in an election. Defs.’ Ex. 576 (Trial Tr. 771, Perez v. Perry, Sept. 8, 2011 (Saucedo)).
v. Hispanic Citizens’ Ability to Elect in Congressional District 23 in the Enacted Plan
56. In the Congressional Plan, CD 23 is 67.8% Hispanic, with an HCVAP of 58.5% and an SSVR of 54.8%. Pl.’s Ex. 12, at 6, 11. The Congressional Plan slightly increases CD 23’s HCVAP by 0.01% and its SSVR by 2.2% over the Benchmark. See Defs.’ Ex. 575 (Trial Tr. 454-55, Perez v. Perry, Sept. 7, 2011 (Dr. Flores stating that “even though the number SSVR is higher I don’t consider it a Hispanic op *211 portunity district at all. I think that a Hispanic candidate would find it very difficult to get elected in the new configuration.”)); PL’s Ex. 11; PL’s Ex. 12.
57. The evidence demonstrates that mapdrawers sought to ensure that the overall performance of Hispanic candidates of choice would decrease. On May 28, 2011, Messrs. Downton, Davis, and Interiano had an email exchange regarding the Attorney OAG’s election analysis results for the Congressional Plan, in which Mr. Interiano asked, “Any guidance on your 23. Have you been able to make any of the changes that we all discussed?” Mr. Downton responded, “Have it over 59 % HCVAP, but still at 1/10. There has to be some level of HCVAP where it doesn’t make a difference what the election results are. It is more Hispanic than the other two San Antonio based districts____” Defs.’ Ex. 903, at 1. In this email, map-drawers referenced the OAG’s reconstituted election analysis, which indicated that candidates supported by Hispanics dropped from winning three out of ten elections in the Benchmark Plan, to one out of ten in enacted CD 23. PL’s Ex. 65; Defs.’ Ex. 390.
58. Mr. Interiano conceded that enacted CD 23 does not perform as a minority ability district. Defs.’ Ex. 779A (Interiano Dep. 96-97, Aug. 2, 2011). David Hanna and Jeffrey Archer from the TLC expressed concern that CD 23 was not “really effective in the proposed map.” Defs.’ Ex. 288. The goal of changes to CD 23 was, in fact, to make the district safer for Congressman Canseco, who is not the Hispanic candidate of choice.
59. Mr. Downton, however, expressed little concern about the performance of CD 23. In proceedings before the U.S. District Court for the Western District of Texas, Mr. Downton testified that he did not consider political performance as particularly relevant. Defs.’ Ex. 577 (Trial Tr. 966, Perez v. Perry, Sept. 9, 2011 (Downton)). He would classify a district as a majority-minority district if it elected the minority candidate of choice three out of ten times or one out of ten times because he believes “that any district where the Hispanic citizen voting age population exceeds 50 percent, it is, by definition, a Hispanic opportunity district.” Id.; Defs.’ Ex. 778A (Downton Dep. 24-25, Aug. 12, 2011). Notwithstanding Texas’s position before this Court that CD 23 is an ability district both in the Benchmark and in the enacted plan, Mr. Downton does not view it as such. He testified that he believed CD 23 “was not an ability to elect district ... before or afterward. It was performing in three out of ten elections before, and one of ten afterward, so in neither case was it performing.” Trial Tr. 87, Jan. 18, 2012 AM (Downton). The Chairmen of the Redistricting Committees, however, testified otherwise. Chairman Seliger testified that no one had told him that CD 23 in the Congressional Plan was predicted to elect the Hispanic preferred candidate in only one out of ten elections. Defs.’ Ex. 776 (Seliger Dep. 24, Sept. 1, 2011); Trial Tr. 13-14, Jan. 24, 2012 AM (Seliger). Chairman Solomons similarly testified that he would consider it problematic if a new congressional plan were to reduce the number of wins by the minority candidate of choice by three or more in a VRA protected district. He stated that it would also be a problem if the number of wins went from three in the base plan down to one and would necessitate a change to the plan. Defs.’ Ex. 580 (Trial Tr. 1605-07, Perez v. Perry, Sept. 13, 2011 (Solomons)). He further testified that if an election analysis reduces the number of wins for minority preferred candidates by one out of ten, it would get his attention and that it *212 was his understanding that legislative council was using that as a basis of then-analysis. Trial Tr. 89, Jan. 20, 2012 PM (Solomons).
60. The ability of Hispanic voters to elect them candidate of choice is lost in enacted CD 23.
b. Congressional District 25
61. In the Benchmark Plan, CD 25 draws 59.7% of its population from south Austin in Travis County, and also incorporates counties southeast of Austin, including Caldwell, Colorado, Fayette, Gonzales, Hays, and Lavaca counties, as well as portions of Bastrop County. Pl.’s Ex. 11. The District as configured in the Benchmark Plan is 38.8% Hispanic, 8.7% Black, and 49.8% Anglo. The citizen voting age population (“CVAP”) is 25.3% Hispanic, 9.1% Black, and 63.1% Anglo. Id. at 7, 9. The SSVR in the District is 20.4%. Id. at 10. As reflected by the above statistics, the combined minority citizen voting age population totals 34.4% and Anglos constitute a majority of voters in the district.
62. CD 25 is currently represented by Congressman Lloyd Doggett. Defs.’ Ex. 802; Trial Tr. 115, Jan. 19, 2012 PM (Dukes). Congressman Doggett won the special election for CD 25 in December 2006, and was reelected in 2008 and 2010.
63. Congressman Doggett is the candidate of choice of minority voters in CD 25. Trial Tr. 101, Jan. 19, 2012 PM (Dukes). A tri-ethnic coalition of Black, Hispanic, and cross-over Anglo voters work together to elect Democratic candidates in the area that CD 25 encompasses.[10] Id. at 85.
64. The success of this tri-ethnic coalition depends on support of some Anglos for Democratic candidates. Trial Tr. 86, Jan. 19, 2012 PM (Dukes).
i. Minority Election Performance
65. Despite the fact that Anglos comprise 63.1% of the CVAP, “the candidate preferred by Blacks and Hispanics [in CD 25 in the Benchmark] has won every congressional election this decade.” Defs.’ Ex. 724, at 5 (Ansolabehere Reb. Rep Jan. 16, 2012); PL’s Ex. 11.
66. Elected officials from areas encompassed by CD 25 testified at trial about the effectiveness of the tri-ethnic coalition and the role of minority voters within that coalition. State Representative Dukes testified that candidates supported by the triethnic coalition are the ones who win in Travis County. Trial Tr. 104, Jan. 19, 2012 PM (Dukes). Candidates are not able to bypass minority voters, and those who only obtain endorsements from Anglo groups in the tri-ethnic coalition do not win elections in Travis County. Id. at 106 (“[I]n general elections in Travis County [ ] if you do not win the Hispanic and African-American boxes that are largely located in the central portion of Travis County, then you are not going to win an election in Travis County without the progressive *213 Anglo[,] black and Hispanic communities. I may not have an Excel spreadsheet, but I can tell you I know my county.”). As an example, Representative Dukes testified that Nelda Wells Spears, an African-American supported by the coalition, successfully defeated an Anglo male “progressive Democrat” with 74% of the vote. Id. at 112.
67. In addition to Representative Dukes, David Escamilla, the Travis County Attorney, provided unrebutted written testimony that political cohesion and cooperation in the tri-ethnic coalition “consistently produces broad agreement to support individual candidates and slates of candidates. The high frequency of agreement on candidates among the organizations within the Coalition also stems from the fact that many individuals are members of more than one of the organizations. This overlap in membership promotes agreement on common slates of political candidates.” Defs.’ Ex. 735, at 7. He provided the example of the 2008 election, in which an Anglo Assistant County Attorney lost a race for a county judgeship despite having “the lion’s share of endorsements from the local Democratic clubs” because he was “unable to gain significant support from the Hispanic or African American community.” Id. at 9-10.[11]
ii. Congressional District 25 in the Congressional Plan
68. In the enacted plan, CD 25 is significantly altered. While CD 25 in the Benchmark extended southeast of Travis County, CD 25 in the enacted plan takes a smaller population from Travis County and extends north to Tarrant County. Compared to its Benchmark configuration, CD 25 in the enacted plan loses population from south Austin and five counties and gains eleven counties. CD 25 in the enacted plan no longer incorporates Bastrop, Caldwell, Colorado, Fayette, Gonzales, and Lavaca counties, and now includes Bosque, Burnet, Coryell, Hamilton, Hill, Johnson, Lampasas, and Somervell counties, as well as portions of Bell, Erath, and Tarrant counties. Compare Pl.’s Ex. 11 with PL’s Ex. 12.
69. State House Representative Dawnna Dukes testified that the Congressional Plan “takes the historical African-American community that was forced by segregation into central Austin and moved it into a majority Republican district that runs west....” Trial Tr. 129, Jan. 19, 2012 PM (Dukes).
70. CD 25 in the Benchmark Plan was overpopulated by 115,893 voters, or by 16.59%, and needed to shed this excess population. PL’s Ex. 11. Compared to the Benchmark, enacted CD 25 retained only 126,507 of the District’s original voters, lost 489,434, and added 392,869 voting age persons. Defs.’ Ex. 724, tbl.C.2 (Ansolabehere Rep. Oct. 21, 2011). In sum, only 28% of the voters in enacted CD 25 are from the Benchmark district. Id. at 39.
71. In the Congressional Plan, CD 25 is 70.3% Anglo, 17.3% Hispanic, and 8.3% Black. PL’s Ex. 12. The CVAP is 78.2% Anglo, 10.3% Hispanic, and 8.1% Black. Id. In short, the citizen voting age population of Hispanics was cut by more than half and of Blacks was reduced by half a *214 percentage point, while the population of Anglos was increased by over fifteen percentage points. In addition, the Anglo population in the new areas added to CD 25 “shows high levels of racial cohesion and polarization” and “85% of Whites in this new district vote for the same candidate.” Defs.’ Ex. 724, at 35-36 (Ansolabehere Rep. Oct. 21, 2011). In contrast to the new areas added to CD 25, the small area that remains from the old district votes 60% for the minority-preferred candidates. Id. at 39. According to Dr. Ansolabehere, CD 25 in the enacted plan no longer provides minorities living in the district the ability to elect their candidates of choice. Id.
c. Congressional District 27
i. Congressional District 27 in the Benchmark Plan
72. In the Benchmark Plan, CD 27 is located in southeastern Texas, and includes the cities of Corpus Christi and Brownsville, the counties of Kenedy, Kleberg, Willacy, and Nueces, as well as portions of Cameron and San Patricio counties. PL’s Ex. 11; Defs.’ Ex. 575 (Trial Tr. 458, Perez v. Perry, Sept. 7, 2011 (Flores)); Defs.’ Ex. 818. Based on 2010 demographic data, CD 27 in the Benchmark had a total Hispanic population of 73.2%, an HVAP of 69.2%, an HCVAP of 63.8%, and an SSVR of 61.1%. PL’s Ex. 11.
73. CD 27 is currently represented by Congressman Blake Farenthold, an Anglo Republican. Congressman Farenthold has been representing CD 27 since 2010, when he defeated twenty-seven year incumbent Solomon Ortiz, a Hispanic Democrat. PL’s Ex. 32, at 13; Trial Tr. 16, Jan. 24, 2012 AM (Chairman Seliger). In the 2010 election, Congressman Farenthold defeated Mr. Ortiz by only 775 votes and received 51,001 votes, or 47.84%, compared to Mr. Ortiz, who received 50,226 votes, or 47.11%. PL’s Ex. 32, at 13.
74. Chairman Seliger recognized that Congressman Farenthold was not the Hispanic candidate of choice in CD 27. Defs.’ Ex. 776 (Seliger Dep. 20, Sept. 1, 2011); Trial Tr. 16-17, Jan. 24, 2012 AM (Seliger). Despite their inability to reelect Mr. Ortiz in 2010, Hispanic citizens in Benchmark CD 27 elected their candidate of choice to the United States House of Representatives in 2004, 2006 and 2008. Defs.’ Ex. 327, at 5 (Handley Congress Rep.).
75. According to Texas’s expert, CD 27 had “performed” from the time of its creation for close to thirty years until the 2010 election. Defs.’ Ex. 581 (Trial Tr. 1870-71, Perez v. Perry, Sept. 14, 2011 (Alford)). Indeed, Chairman Seliger testified that CD 27 in the Benchmark Plan is “clearly an opportunity district.” Defs.’ Ex. 776 (Seliger Dep. 25-26, Sept. 1, 2011); Trial Tr. 17-18, Jan. 24, 2012 AM (Seliger). Chairman Solomons similarly understood that CD 27 was protected under the VRA. Defs.’ Ex. 777 (Solomons Dep. 153, Aug. 31, 2011).
ii. Congressional District 27 in the Congressional Plan
76. According to 2010 Census data, CD 27 in the Benchmark Plan was overpopulated by about 43,000 people. Trial Tr. 99, Jan. 18, 2012 AM (Downton); PL’s Ex. 11. In the Congressional Plan, CD 27 is reconfigured and moved north, keeping the city of Corpus Christi and adding the cities of Victoria, Wharton, and Bay City, but eliminating Brownsville from the district. Mr. Downton acknowledged that CD 27 in the Benchmark Plan and CD 27 in the Congressional Plan are very different districts. Defs,’ Ex. 577 (Trial Tr. 971, Perez v. Perry, Sept. 9, 2011 (Downton)); Defs.’ Ex. 778B (Downton Dep. 48, Aug. 31, *215 2011). The Congressional Plan removes the southern counties of Kenedy, Kleberg, Willacy, and Cameron from the district, and adds Aransas, Calhoun, Jackson, Lavaca, Matagorda, Refugio, Victoria, and Wharton counties, as well as parts of Bastrop, Caldwell, and Gonzales counties. Pl.’s Ex. 12.
77. Mr. Downton testified that he believed that CD 27 was a district protected by the VRA in the Benchmark but was no longer a majority Hispanic district in the Congressional Plan. Defs.’ Ex. 778A (Downton Dep. 32-33, Aug. 12, 2011); Defs.’ Ex. 778B (Downton Dep. 54, Aug. 31, 2011). Similarly, Texas’s expert, Dr. Alford, testified that CD 27 in the Congressional Plan “has flipped, in almost exactly the same way 23 was flipped previously, so it is CD 27 this time that is flipped into being a majority ... Anglo district.” Defs.’ Ex. 581 (Trial Tr. 1829— 30, Perez v. Perry, Sept. 14, 2011 (Alford)).
78. In the Congressional Plan, CD 27 has a total Hispanic population of 49.5%, an HVAP of 45.1%, an HCVAP of 41.1%, and an SSVR of 36.8%. Defs.’ Ex. 859, at 2; Defs.’ Ex. 881, at 1. When compared to the Benchmark Plan, the HVAP decreases by 24.4%, SSVR decreases by 22.6%, and the HCVAP decreases by 22.7% in enacted CD 27.
79. While enacted CD 27 no longer includes counties in South Texas, Nueces County remains in the district. Nueces County is thus no longer included in the South and West Texas configuration of Hispanic ability districts. Trial Tr. 103, Jan. 18, 2012 AM (Downton). Mr. Down-ton testified that, Nueces County effectively is in a different district in the Congressional Plan than in the Benchmark Plan. Defs.’ Ex. 778B (Downton Dep. 49, Aug. 31, 2011).
80. Nueces County has a population of 340,223 and an HCVAP of 54.6%. PL’s Ex. 11; Defs.’ Exs. 883, 746B, 391. In the Benchmark Plan, Nueces County voters constitute over 50% of the total registered voters of CD 27, while in the Congressional Plan, they do not. Trial Tr. 119-20, Jan. 18, 2012 AM (Downton); Defs.’ Ex. 778B (Downton Dep. 54-55, Aug. 31, 2011).
81. According to Mr. Interiano, a goal of the Congressional Plan was to allow Nueces County to anchor a congressional district. That said, Mr. Interiano testified that he did not know what portion of CD 27 voters were in Nueces County under the Benchmark Plan. Defs.’ Ex. 579 (Trial Tr. 1461-62, Perez v. Perry, Sept. 12, 2011 (Interiano)); Defs.’ Ex. 779A (Interiano Dep. 112, Aug. 2, 2011).
82. Mr. Downton conceded that because Benchmark CD 27 was overpopulated by only about 43,000 individuals, if it had simply been the State’s goal to maintain CD 27, he would have had to remove only a few precincts. Trial Tr. 119, Jan. 18, 2012 AM (Downton). Mr. Downton further testified that CD 27 was redrawn to give Congressman Farenthold a better chance of reelection. This could have been accomplished in the Congressional Plan by carving out a small portion of Nueces County containing the incumbent’s home and moving that portion into a northern district, leaving the bulk of Nueces County in a South Texas district. Defs.’ Ex. 778B (Downton Dep. 53-54, Aug. 31, 2011).
83. Chairman Seliger similarly testified that it is conceptually possible to take Congressman Farenthold’s neighborhood, which is located along Gulf Shore Drive in Corpus Christi, and pair it with counties to the north to make him a safer district, leaving the remainder of Nueces County in the district that runs south to Cameron County. Defs.’ Ex. 776 (Seliger Dep. 27- *216 28, Sept. 1, 2011); Trial Tr. 19, Jan. 24, 2012 AM (Chairman Seliger).
84. Mr. Downton testified that the mapdrawers considered and rejected proposals to include Nueces County’s Hispanic population in the South Texas configuration of congressional districts. Trial Tr. 103-04, Jan. 18, 2012 AM (Downton). This decision was in large part a political choice. Id. at 104. According to Mr. Downton, he moved Nueces County north into CD 27 in part because “the Cameron County delegation in the House and the Senate had expressed a preference that they have a District anchored in Cameron County without Nueces so that their county would be the sole anchor point and could control the election.” The Cameron County delegation included State Senator Eddie Lucio, Jr., State Representative Eddie Lucio, III, and State Representative Renee Oliveira, who are all Democrats. Mr. Downton fulfilled these representatives’ requests by creating enacted CD 34, a new district that was intended to be an offset for the loss of CD 27.[12] Trial Tr. 71, Jan. 18, 2012 AM (Downton); Trial Tr. 118, Jan. 18, 2012 AM (Downton); Defs.’ Ex. 575 (Trial Tr. 485-86, Perez v. Perry, Sept. 7, 2011 (Flores)); Defs.’ Ex. 577 (Trial Tr. 971, Perez v. Perry, Sept. 9, 2011 (Downton)); Defs.’ Ex. 778A (Downton Dep. 31-32, 66, Aug. 12, 2011).
85. As configured in the Congressional Plan, CD 27 does not provide Hispanic citizens the ability to elect their candidates of choice.
E. Discriminatory Purpose in the Congressional Plan
a. Disparate Impact on Minority Congresspersons
i. Congressional District 9
86. In the Benchmark Plan, CD 9 is located south of Houston and incorporates parts of Harris and Fort Bend counties. Pl.’s Ex. 11. This district provides Black and Hispanic citizens the ability to elect the candidate of them choice.
87. Based on 2010 demographic data, CD 9 is 36.7% Black and 42.4% Hispanic. The district has a BVAP of 36.3%, an HCVAP of 19.1%, and an SSVR of 16.2%. PL’s Ex. 11, at 4, 10-11. Congressman A1 Green has represented CD 9 since 2005.
88. In the Benchmark Plan, CD 9 has a surplus of 35,508 people, or 5.05%. Defs.’ Ex. 347, at 28. While this district was required to shed a small percentage of population, Congressman Green testified that his district had “substantial surgery” done to it. Trial Tr. 124-25, Jan. 20, 2012 AM (Congressman Green). Primarily Black communities, such as Hiram Clarke, were removed from his district, along with “economic engines,” such as the rail line, Houston Baptist University, the Medical Center, and the Astrodome. The removal of these areas substantially decreased the political power of the citizens in his dis *217 trict. Defs.’ Ex. 721, at 4; Trial Tr. 124-25, Jan. 20, 2012 AM (Congressman Green).
89. In addition to removing key landmarks from his district, the Congressional Plan removes Congressman Green’s district office. Congressman Green testified that the “district office provides a meaningful connection between a member and the people represented. Our district office is in a location that is well-known to my constituents and has been in its present location since 2006; it has easy access to major freeways, mass transit, and many of the important centers of business activity within the Ninth Congressional District such as the Texas Medical Center, the VA hospital, and the Astrodome complex. Other similar properties in the area have been surgically removed; this couldn’t have been done by accident.” Defs.’ Ex. 721, at 4 (Congressman Green Pre-filed Direct Testimony).
ii. Congressional District 18
90. In the Benchmark Plan, CD 18 is located in Houston and within Harris County. Pl.’s Ex. 11. Based on 2010 demographic data, CD 18 in the Benchmark Plan is 43.5% Hispanic, 37.6% Black, and 15.8% Anglo. The district has a BVAP of 46.4%, an HCVAP of 22.3%, and an SSVR of 18.4%. Id. at 6, 9-10. Congresswoman Sheila Jackson Lee has represented CD 18 since 1995.
91. Congresswoman Jackson Lee testified that during the 2011 redistricting process, she traveled to Texas to meet with the Chairmen of the House and Senate Redistricting Committees, and went to a public redistricting hearing to urge state lawmakers to respect communities of interest in CD 18. Trial Tr. 9-11, Jan. 23, 2012 PM (Congresswoman Jackson Lee). These requests, however, were unheeded and she was never contacted to discuss changes to CD 18. Id.
92. Based on 2010 demographics, CD 18 in the Benchmark is over-populated by 22,503 people, or 3.22%, which thus required only minor changes to reach the ideal population size. Defs.’ Ex. 347, at 29 (Murray Rep.). Nonetheless, in the Congressional Plan, the district’s key economic generators, as well as Congresswoman Jackson Lee’s district office are removed. Trial Tr. 13-14, Jan. 23, 2012 PM (Congresswoman Jackson Lee). Congresswoman Jackson Lee testified that her district office has been in the same location for a lengthy period of time, having been used by the previous two representatives of CD 18, including former Congresswoman Barbara Jordan. Consequently, constituents in the district know where the office is and go there to seek services. Id. In addition to removing her district office, the Congressional Plan also splits the historic Third Ward-MacGregor area, an important Houston community and home to many of Houston’s African-American leaders. This area has been in CD 18 since the district’s creation in 1972. Defs.’ Ex. 577 (Trial Tr. 1051, Perez v. Perry, Sept. 9, 2011 (Murray)); Trial Tr. 12-13, Jan. 23, 2012 PM (Congresswoman Jackson Lee).
iii. Congressional District 30
93. In the Benchmark Plan, CD 30 is located in Dallas within Dallas County. PL’s Ex. 11.
94. Based on 2010 demographic data, CD 30 is currently 42.4% Black, 39.7% Hispanic, and 16.7% Anglo. The district has a BVAP of 42.5%, an HCVAP of 19.8%, and an SSVR of 14.6%. PL’s Ex. 11, at 7, 9-10. Since 1992, Congresswoman Eddie Bernice Johnson has represented CD 30. Trial Tr. 67, 69, Jan. 18, 2012 PM (Congresswoman Johnson).
*218 95. Benchmark CD 30 has only 7,891 people over the ideal population, or 1.14%, and thus required only minor changes to reach the ideal population size. Pl.’s Ex. 11. Despite this fact, significant changes were made to CD 30, including the addition of a large prison, which artificially inflated the Black population in the enacted district. Trial Tr. 81, Jan. 18, 2012 PM (Congresswoman Johnson); Defs.’ Ex. 579 (Trial Tr. 1276, Perez v. Perry, Sept. 12, 2011 (Congresswoman Johnson)).
96. The Congressional Plan removes from the district Congresswoman Johnson’s district office and even her own home. Trial Tr. 79, Jan. 18, 2012 PM (Congresswoman Johnson). Congresswoman Johnson testified that the removal of her district office would be a significant loss to her community because her constituents are familiar with her office and it is easily accessible. Id. at 79-80.
97. In addition to her district office and home, the Congressional Plan removes economic generators from the district, including areas that Congresswoman Johnson has worked to improve, such as the American Center, where the Dallas Mavericks play, transportation areas for the downtown park, and the arts district. Trial Tr. 81, Jan. 18, 2012 PM (Congresswoman Johnson).
iv. Congressional District 20
98. Hispanic Congressman Charlie Gonzalez represents CD 20. In the Congressional Plan, his district office is removed from CD 20. The enacted plan also removes key economic and cultural landmarks from Congressman Gonzalez’s district, including the Alamo and the Convention Center named after Congressman Gonzalez’s father. Devaney Deck, Ex. 16 (Deck of Congressman Charles Gonzales, ¶¶ 3-9,11).
v. Comparative Treatment of Anglo Congresspersons
99. While all three Black Congresspersons and Hispanic Congressman Gonzalez had their district offices removed from their re-configured districts, and Congresswoman Johnson even had her home removed, no Anglo Congressperson had his or her district office or home removed from his or her district as a result of the re-districting process. Trial Tr. 14, Jan. 18, 2012 PM (Congresswoman Jackson Lee); Trial Tr. 80, Jan. 18, 2012 PM (Congresswoman Johnson).
100. While minority Congresspersons had key landmarks in their districts removed, the mapdrawers accommodated requests from Anglo Congresspersons to include in their districts country clubs and grandchildren’s schools. Devaney Deck, Exs. 19-21. For example, mapdrawers ensured that Anglo Congresswoman Kay Granger, whose office originally had been drawn out of her district, had her office restored before adoption of the final plan. Devaney Deck, Ex. 5 (Opiela Dep. 63, Aug. 22, 2011); id., Ex. 17. Anglo Congressman Kenny Marchant requested on May 31, 2011, that his district lines be drawn to cross a street to include his grandchildren’s school. Id., Ex. 18. Mapdrawers accommodated that request. Anglo Congressman Lamar Smith requested on June 8, 2011, that his district lines be drawn to include a precinct with the San Antonio Country Club. Id., Ex. 19. The Republican leadership also granted that request. Devaney Deck, Ex. 20.
101. With regard to the removal of district offices, Mr. Interiano testified that the mapdrawers did not have the addresses of any congressional district offices when they were redrawing the congressional map. Mr. Interiano stated that it was just “coincidence” that minority Con *219 gresspersons had their district offices removed. Trial Tr. 95, Jan. 25, 2012 PM (Interiano). The Court finds that this testimony is not credible.
b. Configuration of Congressional Districts in North Texas
102. In the Benchmark Plan, nine congressional districts converge in the Dallas-Fort Worth metroplex. Defs.’ Ex. 818, at 1. Of these nine districts, CD 30 is the only minority ability district. Defs.’ Ex. 327, at 2 (Handley Congress Rep.).
103. The Dallas-Fort Worth metroplex is located in north Texas, and is spread across Dallas and Tarrant counties. Between 2000 and 2010, the non-Anglo population in Dallas County grew by 28%, accounting for 100% of the population growth in the county. During the same period, the Anglo population declined by 20%. Defs.’ Ex. 734, at 5-6 (Supp. Rep. of Rogelio Saenz). The non-Anglo population in Tarrant County grew 12 times faster than the Anglo population, accounting for 89% of the population growth there. Id. According to 2010 census data, Blacks and Hispanics now account for a combined 55% of the voting age population in Dallas County and 37% of the voting age population in Tarrant County. Mot. for Judicial Notice, ECF No. 180, ¶¶ 33, 37.
104. Due to significant population growth in Dallas and Tarrant counties, the Congressional Plan allocates CD 33, one of the State’s newly apportioned congressional districts that will be Anglo controlled, to the area. Pl.’s Ex. 12. The Dallas-Fort Worth metroplex will thus have ten congressional districts converge in the area in the Congressional Plan, but CD 30 remains the only minority ability district among them. Id.
105. Despite significant minority population growth, and the addition of another congressional district, the Congressional Plan does not reflect the minority growth in the Dallas-Fort Worth metroplex. Trial Tr. 13, Jan. 18, 2012 PM (Rep. Veasey); Defs.’ Ex. 320, ¶¶ 148-52 (Arrington Rep.). The Congressional Plan divides the urban, minority population in the Dallas-Fort Worth metroplex among four Anglo-controlled congressional districts, CD 6, CD 12, CD 26, and new CD 33. Trial Tr. 16-17, Jan. 18, 2012 PM (Rep. Veasey); Defs.’ Ex. 320, ¶¶ 148-152 (Arrington Rep.); Defs.’ Exs. 677-80, 683-84; Trial Tr. 75, Jan. 18, 2012 PM (Congresswoman Johnson testifying that the Congressional Plan has been configured to break “solid African-American and Latino growth up in one, two, three, four, five or six different districts”).
106. To rebut claims that minorities in the Dallas-Fort Worth metroplex were either fractured into Anglo-dominated districts or packed into CD 30, Mr. Downton testified, that it was difficult to draw a Hispanic district in the Dallas-Fort Worth metroplex because “a significant part” of the population growth was either non-citizen, under 18, or “assimilated.” Trial Tr. 74, Jan. 18, 2012 AM (Downton).
107. The Republican congressional delegation, through Congressman Lamar Smith, MALDEF, MALC and Representative Veasey all presented Mr. Downton with “concepts” for North Texas, but Mr. Downton stated that none of these groups provided him with a proposed map during the regular or special session. Trial Tr. 73, Jan. 18, 2012 AM (Downton).
108. Mr. Downton’s testimony on this issue is not accurate. In early April 2011, Congressman Lamar Smith, on behalf of a majority of the Texas Republican congressional delegation, distributed a draft congressional map to Republican leaders of the Texas Legislature, as well as the Lieu *220 tenant Governor and Governor. Defs.’ Ex. 394. Congressman Smith’s map created “one new Voting Rights Act district in the Dallas-Ft. Worth area,” which, inter alia, “reflects the population growth in Texas over the last decade.” Id.
109. Representative Veasey testified that when he heard through the local paper that the Congressman Lamar Smith and the Republican congressional delegation had proposed a map with another minority congressional district in north Texas, in addition to CD 30, he approached Chairman Solomons and asked to see it. Chairman Solomons responded that there was no such map. Representative Veasey testified that he subsequently learned that Chairman Solomons had, in fact, seen Congressman Smith’s proposed map. Trial Tr. 15-16, Jan. 18, 2012 PM (Rep. Veasey).
i. Congressional Districts 6, 12, and 33
110. CD 6 in the Benchmark Plan is anchored in the heavily Anglo counties of Ellis and Navarro and reaches into both Dallas County and Tarrant County to include heavily Hispanic neighborhoods in Dallas County and areas of Tarrant County with rapidly growing Hispanic and Black population areas. Trial Tr. 21, Jan. 18, 2012 PM (Rep. Veasey); Defs.’ Ex. 819 at 1. CD 6 in the Benchmark has a combined Black and Hispanic CVAP of 38.6%, with most of the minority population in Dallas County. Defs.’ Ex. 857, at 2.
111. CD 12 in the Benchmark is based in northern Tarrant County, which is comprised of affluent Anglo communities. The district also incorporates southeast Fort Worth, which is a Black community. Southeast Fort Worth is situated south of Interstate 30 and east of Interstate 35 and is made up of several inner-city, low-income communities that are predominantly minority.
112. CD 33 is one of the State’s newly apportioned congressional districts. In the Congressional Plan, this district includes all of Parker County and parts of Wise County, both of which are predominantly comprised of Anglo, suburban areas. Anglos make up 85.3% of the population in Parker County and the portion of Wise County included in CD 33 is 78.7% Anglo. Pl.’s Ex. 12. In addition to those Anglo areas, CD 33 cuts into Tarrant County to include Tarrant County’s fast-growing minority populations. Representative Veasey testified that enacted CD 33 “goes around southwest — underneath southeast Ft. Worth in the unincorporated Tarrant County, and then moves into Arlington, into the heavily Anglo part of Arlington, and then picks up the fast minority growth area in southeast Tarrant County, Arlington — southeast Arlington-Grand Prairie area.” Trial Tr. 23, Jan. 18, 2012 PM (Rep. Veasey).
ii. Congressional District 26
113. CD 26 in the Benchmark Plan covers parts of Cooke, Dallas, Denton, and Tarrant counties. Pl.’s Ex. 11. Benchmark CD 26 is anchored in Denton County, and then reaches south into the center of Tarrant County in a long peninsula-like strip, incorporating 363,872 individuals. The population of benchmark CD 26 in Tarrant County is 45.5% Anglo, 24.4% Black, and 26.5% Hispanic. Pl.’s Ex. 12.
114. In the Congressional Plan, CD 26 covers parts of three counties: Dallas, Denton, and Tarrant, with most of Denton County within the district. Pl.’s Ex. 12, at 1, 7. The portion of Denton County in CD 26 is 67.1% Anglo. Id.; Trial Tr. 18, Jan. 18, 2012 PM (Rep. Veasey). CD 26 also includes a small portion of Dallas County *221 containing 841 individuals, who are 43.9% Anglo. PL’s Ex. 12, at 7. In addition to these Denton County and Dallas County areas, CD 26 in the Congressional Plan runs down the center of Tarrant County in an exaggerated “lightning bolt” shape to capture 147,815 individuals, 65.2% of whom are Hispanic. Id.; Defs.’ Ex. 75.
[[Image here]]
Enacted CD 26
115. The “lightning bolt” into Tarrant County divides two significant minority communities of interest in Tarrant County — North Side and South Fort Worth— and moves these areas to CD 12, a district represented by Anglo Republican Congresswoman Kay Granger. North Side is an urban, low-income, majority Hispanic community in Fort Worth. South Fort Worth is another urban, low-income, majority Hispanic community in Fort Worth. Trial Tr. 19, Jan. 18, 2012 PM (Rep. Veasey); Trial Tr. 98-99, Jan. 18, 2012 PM (Jiminez).
116. The boundary between enacted CD 26 and enacted CD 12 in Tarrant County — the eastern boundary of the “hghtning bolt” — divides minority communities according to race. Defs.’ Ex. 630; PL’s Ex. 133.
117. The “lightning bolt” running through Tarrant County in the Congressional Plan contains 38 splits of voter tabulation districts (“VTD”).[13] Defs.’ Ex. 875, at 10-11. The purpose behind the split VTDs was to move Hispanic populations into enacted CD 26 and split the non-Hispanic population out of the district. Defs.’ Ex. 887 at 74-82, 185-88. Mr. Downton testified that he drew the map to keep the Hispanic population together, even though he also testified that these Hispanic populations may not want to be submerged into Denton County. Defs.’ Ex. 778A (Downton Dep. 130-131, Aug. 12, 2011).
118. In an effort to explain the configuration of the “lightning bolt” in the Congressional Plan, Mr. Downton testified that the “lightning bolt” running from *222 Denton County to Tarrant County went through “multiple iterations and changes based on concerns raised by various people throughout the process.” Trial Tr. 68, Jan. 18, 2012 AM (Downton). According to Mr. Downton, the “lightning bolt” went further down into Fort Worth because “concerns were raised that we had split the Hispanic population of the City of Fort Worth between a group in the ... northern side of Fort Worth which we had put in 26 and a group down in the southern part of Fort Worth that we had put in 12. So to rectify that concern we reached down further ... and ... the two Fort Worth Hispanic communities which we were told shared a community of interest, we put them in 26. Initially when we did that, it looked a little cleaner coming down, but in doing that we had taken out downtown Fort Worth and the [Trinity Vision] project out of District 12. Congressman Granger expressed concern that she really needed those areas in her District.... Then we made an additional change over Representative Veasey’s request that primarily the black community we had put in 26 and he asked us to move that to 12 and so we did that as well.” Id. at 68-69.
119.The assertion that the jagged edges in the “lightning bolt” were due to Congresswoman Granger’s request to keep the Trinity Vision Project in CD 12, is disputed by other evidence in the record. Specifically, Tarrant County Commissioner Roy Brooks stated in a memorandum, dated September 15, 2011, to the DOJ: “Frankly, you are not being told the truth.... I have no doubt that the State wants Trinity Vision to remain in CD 12. However, using the project to explain and excuse their racially discriminatory map is flatly dishonest.” Defs.’ Ex. 113. Mr. Brooks further stated that “[t]he contorted lines south of the Trinity Vision site reflect a careful effort to include Hispanic precincts and blocks in CD 26 while placing African American precincts and blocks in CD 12. Any difficulty in retaining Trinity Vision in CD12 was caused by the State placing a higher priority on separating black and Hispanic voters from each other.” Id.
iii. Packing of Minorities into Congressional District 30
120. Evidence presented to the Court demonstrates that the Congressional Plan concentrates a large part of Dallas County’s minority population into enacted CD 30. Enacted CD 30 has a BVAP of 45.6% and an HVAP of 40.3 %, which increases the combined minority voting age population from the Benchmark district by 4.8%. Compare Defs.’ Ex. 859, at 2 with Defs.’ Ex. 858, at 2.
II. STATE SENATE PLAN
121. There are 31 seats in the State Senate. Senators serve terms of four years.
122. On July 24, 2001, following the failure of the Texas State Legislature to enact a redistricting plan for the State Senate, the Texas Legislative Redistricting Board adopted a plan to redistrict all 31 Senate seats. This plan was precleared by the DOJ on October 15, 2001. This is the Benchmark State Senate Plan (the “Benchmark Plan”) for the purposes of this case.
123. Redistricting maps for the State House and State Senate must be passed during the general legislative session. Otherwise, the maps are drawn by a Legislative Redistricting Board that is designated by statute and consists of the State’s Lieutenant Governor, Speaker of the House, Attorney General, Comptroller, and Land Commissioner.
*223 124. On May 17, 2011, the State Senate passed Senate Bill 31, containing a new redistricting plan for the State Senate based on the 2010 Census, and the Governor signed it into law on June 17, 2011 (the “State Senate Plan”). This is the Plan for which Texas is seeking preclearance.
125. SD 10 is represented by Senator Wendy Davis in the Benchmark Plan and its configuration in the State Senate Plan is the only challenge to the State Senate Plan before the Court.
A. State Senate Redistricting Process
126. Doug Davis, the director for the Senate Select Committee on Redistricting, was the principle mapdrawer for the State Senate Plan. Trial Tr. 140, Jan. 17, 2012 PM (D. Davis).
127. In September 2010, the Senate Redistricting Committee held seven field hearings across the State to “receive input from the public” on redistricting. Trial Tr. 145, Jan. 17, 2012 PM (D. Davis).
128. Redistricting hearings for the State Senate Plan were held in “population centers” around the State, but none was held in Tarrant County by the Senate Redistricting Committee. Trial Tr. 17, Jan. 18, 2012 AM (D. Davis).
129. The State House Committee on Redistricting held the only hearing in Tar-rant County in Arlington, which has the dubious distinction of being the largest city in the United States that lacks both public bus and rail service, Trial Tr. 8, Jan. 18, 2012 PM (Rep. Veasey), and therefore is not fully accessible without private transportation. As discussed, Rep. Veasey specifically asked that a public hearing be held in Fort Worth and offered to locate an appropriate site, but his request was ignored. Id. at 8-10.
130. Senator Judith Zaffirini, a Hispanic who served on the Senate Redistricting Committee in 2011 and who had been through several past Senate redistricting cycles, said that the field hearings were “a sham” because of low attendance and participation, lack of invited testimony, and lack of prepared materials for members of the Redistricting Committee. Defs.’ Ex. 189 (Zaffirini Dep. 7-8, Jan. 6, 2012). Senator Rodney Ellis similarly testified that these hearings had very limited attendance and were “fairly perfunctory.” Trial Tr. 94-95, Jan. 20, 2012 AM. Both Senators’ testimony is credited by this Court.
131. Chairman Seliger and Doug Davis met with Senator Davis in March 2011 and asked her what changes she would like made to SD 10. Trial Tr. 35, Jan. 20, 2012 AM (Sen. Davis). She told them that the urban cores of Fort Worth and Arlington were “very important” to the District and that she felt “it was important to keep the district wholly contained within Tarrant County.” Id.
132. During late April 2011, draft redistricting maps were available for viewing in a room adjacent to the State Senate floor, but only by invitation. Those senators who were invited to look would leave the floor of the State Senate with Chairman Seliger and Mr. Davis to review the draft proposals and provide comments on them. Trial Tr. 39, Jan. 20, 2012 AM (Sen. Davis).
133. Senator Ellis testified that senators who represented “minority districts” were left out of the redistricting process. Trial Tr. 95, Jan. 20, 2012 AM (Sen. Ellis). Senator Zaffirini testified that Anglo senators had access to view the plans for their districts and the overall State Senate Plan but minority senators did not. Defs.’ Ex. 809 (Zaffirini Dep. 29-30, Jan. 6, 2012). She characterized the redistricting in 2011 *224 as the “least collaborative and most exclusive” she had ever experienced. Defs.’ Ex. 134, Lichtman Rep. app. 7 (Decl. of Judith Zaffirini, ¶ 3).
134. Throughout April and May, Senator Davis constantly asked Mr. Davis and Chairman Seliger to see the map for her district. Trial Tr. 38-39, 42, Jan. 20, 2012 AM (Sen. Davis). Senator Davis was not shown any drafts and it was not until May 10, 2011 that she saw her district for the first time. Id. at 42; Defs.’ Ex. 128. On that date, Senator Davis sent a letter to Chairman Seliger, expressing concern that minority voting rights were badly undermined by the State Senate Plan and that excluding her from the process, as the representative of several minority communities, contributed to this result. Defs.’ Ex. 128.
135. Mr. Davis explained that he did not show Senator Davis how her district was re-drawn because “we were not printing maps and giving them to members.” Trial Tr. 172, Jan. 17, 2012 PM (D. Davis); see also id. at 173. On the contrary, Chairman Seliger admitted that he provided maps to three other senators who represent majority-Anglo districts. Trial Tr. 67-68, Jan. 24, 2012 AM (Chairman Seliger); see also Defs.’ Ex. 646 (Dep. of Sen. Jane Nelson 10-11, Jan. 6, 2012).
136. Senator Davis appeared at the May 12, 2011 Senate Select Committee on Redistricting hearing to testify against the State Senate Plan. Trial Tr. 9-10, Jan. 18, 2012 AM (D. Davis). Because Senator Davis was not a member of the Committee, she could not propose amendments in Committee. Senator Zaffirini sponsored amendments on her behalf. Trial. Tr. 43^5, Jan. 20, 2012 AM (Sen. Davis). These amendments were designed to “strengthen[ ] the African American and Latino makeup of [SD 10].” Id. at 45. Neither of these plans passed the committee vote. Senator Davis again offered amendments on the floor of the State Senate, but was defeated in a “party line” vote. Trial. Tr. 12, Jan. 18, 2012 AM (D. Davis).
137. The formal Senate redistricting process began on May 12, 2011 and the bill was passed to the State House on May 18, 2011, six days later. Defs.’ Ex. 156. The State Senate passed the redistricting plan by a roll call vote of 29-2. Only Senators Davis and Ellis voted against it.
138. On Wednesday, May 11, 2011, the day before the public hearing on the State Senate Plan, David Hanna an attorney at the TLC, responded to an email from Karina Davis, the Senate Parliamentarian (and Doug Davis’s wife), with a copy to Mr. Davis. Ms. Davis had inquired about “pre-doing the committee report,” Defs.’ Ex. 359, but Mr. Hanna advised “No bueno [no good]. RedAppl time stamps everything when it assigns a plan. Doing it Thursday would create paper trail that some amendments were not going to be considered at all. Don’t think this is good idea for preclearance.” Id.
139. Although Chairman Seliger testified that he never knew about the Davis-Hanna email, he did agree that he knew on May 11, 2011 that none of Senator Davis’s proposed amendments to the State Senate Plan would pass. Trial Tr. 70-71, Jan. 24, 2012 AM (Chairman Seliger).
B. Senate District 10
140. SD 10 in the Benchmark is a geographically compact district located entirely within Tarrant County that includes most of Fort Worth, Texas.
141. The 2010 Census reported that SD 10’s population is 19.2% Black, 28.9% Hispanic, 4.9% other minorities (ie., ap *225 proximately 53% minorities) and 47.6% Anglo. Defs.’ Ex. 151, at 5. However, the 2010 Census showed an 18.3% Black Citizen Voting Age Population (“BCVAP”), 15.1% HCVAP, 62.7% White Citizen Voting Age Population (“WCVAP”), and a 2.6% Asian-American citizen voting age population in the district. PL’s Ex. 15, at 8.
142. In 2006, an Anglo Democrat, Terri Moore, ran for District Attorney in Tar-rant County but lost with close to 50% of the vote. Trial Tr. 30, Jan. 18, 2012 PM (Rep. Veasey). This election result caught the attention of State House Representative Marc Veasey, who studied the 2006 election results to see whether Black and Hispanic voters could elect a candidate of choice in SD 10. Representative Veasey concluded that “when African-American and Hispanic communities came together as a coalition to win, ... they could win Senate District 10.” Id.
143. Thereafter, a coalition of Black and Hispanic community leaders in SD 10 visited Wendy Davis, an Anglo with deep minority support who was then serving on the Fort Worth City Council, and asked her to run for the State Senate in SD 10 in 2008. Trial Tr. 16-19, Jan. 20, 2012 AM (Sen. Davis).
144. During her campaign, Senator Davis “spent a great deal of time going into [Black and Hispanic] neighborhood meetings, knocking [on] doors in those communities and attending churches and speaking to church congregations in those communities.” Trial Tr. 21, Jan. 20, 2012 AM (Sen. Davis).
145. According to the Chairman of the Texas State Democratic Party, Boyd Richie, “there was a concerted effort to build support from and mobilize African-American and Hispanic voters and to have them unite in their electoral support for Wendy Davis.” Defs.’ Ex. 732, at 3 (Deck of Boyd Richie). Senator Davis corroborated this testimony and is credited by this Court.
146. Senator Davis had no primary opponent and ran against the Anglo Republican incumbent, Senator Kim Brimer, in the general election in 2008. Senator Davis testified that Senator Brimer was “incredibly well funded” and had “the endorsement of every mayor and the police and fire unions, and had mayors appearing in television commercials with him endorsing him.” Trial Tr. 67-68, Jan. 20, 2012 AM (Sen. Davis).
147. Senator Davis won the election to the State Senate in 2008 by approximately 7,100 of the 288,000 votes cast in SD 10. Senator Davis received 147,832 votes (49.91%); former Senator Brimer received 140,737 votes (47.52%); and Libertarian Party candidate Richard Cross received 7,591 (2.56%). PL’s Ex. 110, at 4.
148. Dr. Alford, Texas’s expert witness, calculated that Senator Davis was elected with 99.6% of the Black vote, 85.3% of the Hispanic vote, and 25.8% of the Anglo vote. Trial Tr. 32-33, Jan. 25, 2012 AM (Alford).
149. The Court finds that the election of Senator Davis in 2008 demonstrated a successful three-way coalition of Blacks, Hispanics and some cross-over Anglos in SD 10. Since, however, there has been no occasion for Senator Davis to win reelection, and no evidence of the coalition’s success in other elections, the Court concludes that the ability of minorities to elect candidates of choice in SD 10 has insufficient history to afford it protection as a Benchmark ability district for purposes of redistricting in 2011.
150. Nonetheless, the Court concludes that the record demonstrates purposeful discrimination in the re-drawing of SD 10.
*226 C. Dismantling of Senate District 10’s Minority Coalition
151. SD 10 in the Benchmark is comprised of almost all the traditional and growing minority neighborhoods of Tar-rant County in and around Fort Worth, including the historic Northside Hispanic area, the growing Southside Hispanic area, Defs.’ Exs. 138, 657; Trial Tr. 21-22, Jan. 18, 2012 AM (D. Davis), and the predominantly Black areas of Southeast Fort Worth, Forest Hill, and Everman. Defs.’ Exs. 136, 657; Trial Tr. 21-22, Jan. 18, 2012 AM (D. Davis).
152. These areas were broken apart and placed into Anglo-controlled districts in the State Senate Plan, specifically enacted SDs 12 and 22. Defs.’ Ex. 141; PL’s Ex. 16 (showing that enacted SD 12 has a 61% Anglo population and a 75.5% WCVAP and enacted SD 22 has a 61.3% Anglo population and a 72.3% WCVAP).
153. The ideal district size for a senate district in the State Senate Plan is 811,147 individuals. Trial Tr. 149, Jan. 17, 2012 PM (D. Davis). The 2010 Census showed Benchmark SD 10 to have a population of 834,265, which is 23,118 more than the ideal number for a senate district in Texas. Defs.’ Ex. 151, at 5. The additional population in Benchmark SD 10, however, is well within the populations deviation accepted for redistricting in the State Senate Plan by the State and there is no evidence this “over-population” played any part in redrawing the district. See PL’s Ex. 35 at 32.
154. The maps below show Benchmark SD 10 and enacted SD 10 and the surrounding districts, particularly SDs 12, 9, and 22.
[[Image here]]
Benchmark SD 10
*227 [[Image here]]
Enacted SD 10
155. A closer examination of the area of Fort Worth (below) clarifies the cracking of the minority communities from SD 10 in the State Senate Plan. An excerpt of the map above is below depicting Fort Worth and its surrounding areas, which are enclosed within the loop shape. The loop, which represents Interstate 820, is intersected by Texas State Highway 30 running east to west and Interstate 35 running north to south, which create four quadrants within the loop.
[[Image here]]
Benchmark SD 10
*228 [[Image here]]
Enacted SD 10
156. In the southeast quadrant lies a large Black community in Southeast Fort Worth, described as “the core urban community of Fort Worth,” Trial Tr. 42, Jan. 20, 2012 AM (Sen. Davis). Southeast Fort Worth continues south of Interstate 820 where it remains a predominantly minority community. Defs.’ Exs. 657, 136. This area is moved from Benchmark SD 10 into enacted SD 22 in the State Senate Plan. Id.
157. Within the northwest quadrant is the community known as the “north side Latino community,” Trial Tr. 28-29, Jan. 20, 2012 AM (Sen. Davis); Defs.’ Ex. 657, which is moved out of SD 10 into enacted SD 12 in the State Senate Plan. Id. at 42.
158. Overall, an examination of enacted SD 10 shows that it is drawn in a bow-tie shape in order to exclude many of the urban minority communities in Tarrant County that are in Benchmark SD 10. Defs.’ Ex. 141.
159. Senator Rodney Ellis explained in a letter to the DOJ: “The demolition of [Senate] District 10 was achieved by cracking the African American and Hispanic voters into three other districts that share few, if any, common interests with the existing District’s minority coalition. The African American community in Fort Worth is ‘exported’ into rural District 22— an Anglo-controlled District that stretches over 120 miles south to Falls [County]. The Hispanic Ft. Worth North Side community is placed in Anglo suburban District 12, based in Denton County, while the growing South side Hispanic population remains in the reconfigured majority Anglo District 10.” Defs.’ Ex. 375, at 3.
160. Dr. Alan J. Lichtman, an expert witness for the Davis Intervenors, echoed in his report: “[The] [S]tate legislature, in dismantling benchmark SD 10[,] cracked the politically cohesive and geographically concentrated Latino and Arican American communities and placed members of those communities in districts in which they have no opportunity to elect candidates of their choice or participate effectively in the political process.” Defs.’ Ex. 134, ¶ 12 (“Lichtman Rep.”).
161. Over 53,000 persons are moved from SD 10 into SD 12 in the State Senate Plan, of whom 89.5% are Hispanic or Black, even though Benchmark SD 12 is already over-populated by more than 200,-000 people. Defs.’ Ex. 151, at 2. Likewise, 104,703 persons are moved from SD 10 to SD 22, of which 78.2% are either Hispanic or Black. Id. at 3.
162. Doug Davis admitted that he knew that the areas he cut out of SD 10 were minority neighborhoods. Trial Tr. 22, Jan. 18, 2012 PM (D. Davis). Chairman Seliger also admitted that he knew that many of the neighborhoods being moved out of SD 10, including Everman and Forest Hills, were minority neighborhoods. Trial Tr. 56-57, Jan. 24, 2012 AM (Chairman Seliger).
*229 163. Mapdrawers attribute the changes to SD 10 to partisanship, stating that one of the goals in drawing the State Senate Plan was to increase the Republican voting strength in four districts. Trial Tr. 144, 161, Jan. 17, 2012 PM (D. Davis). SD 10 was one of those districts. Id. at 160.
164. SD 10 is a majority Anglo district in the State Senate Plan. The Anglo population is 54.5% of the enacted district’s population, 6.9% higher than the Benchmark; the Black population is 14.6%, a 4.6% decrease from the Benchmark; and the Hispanic population is 25.9%, a 3% decrease from the Benchmark. Pl.’s Ex. 15, at 4; Pl.’s Ex. 16, at 4. Furthermore, the WCVAP increases to 69.5% of the enacted district’s citizen voting age population, 6.8% higher from the Benchmark; the HCVAP in enacted SD 10 is 13.6%, 1.5% lower than in the Benchmark; the BCVAP is 12.8%, 5.5% lower than in the Benchmark; and the Asian-American citizen voting population CVAP increases from .1% to 2.7%. Pl.’s Ex. 15, at 8; PL’s Ex. 16 at 9.
165. In 2001, the State of Texas predicted that SD 10 could become a district where the minority community would grow to be able to elect a candidate of its choice. Trial Tr. 36, Jan. 20, 2012 AM (Sen. Davis). In the State Senate election of 2008, SD 10 exhibited the real-life potential of that prediction. In 2011, the State Senate cracked SD 10 and removed most of its minority populations, spreading them into predominately Anglo districts and effectively dismantling the coalition that had elected Senator Davis.
166. The dismantling of SD 10 will have a disparate and negative impact on minority groups in the District.
I. STATE HOUSE PLAN
167. There are 150 Members (the “Members”) of the State House, who run for office every two years. There are currently 101 Republican Members and 49 Democratic Members. Trial Tr. 133, Jan. 17, 2012 AM (Interiano).
168. The Texas State Constitution provides that its Legislature will meet every two years. The Legislature is sworn in on the second Tuesday of every odd-numbered year and meets for 140 days, unless a special session is called by the Governor. The committees within the Legislature are typically not appointed until February and, therefore, legislation is not usually considered until mid-February, when the general legislative session begins. Actual legislative consideration of bills and their passage primarily takes place between February and May of a legislative year. Trial Tr. 61-62, Jan. 17, 2012 AM (Hunter). There are approximately 70 to 80 days that are available within a regular legislative session to pass a bill in the State House. Trial Tr. 70, Jan 20, 2012 PM (Chairman Solomons).
169. On November 28, 2001, a three-judge district court adopted a redistricting plan for the State House in Balderas v. Texas, No. 6:01-cv-158, 2001 WL 34104833 (E.D.Tex. Nov. 28, 2001), based on the 2000 Census. That plan is the Benchmark Plan for purposes of this case.
170. When the State House failed to pass a redistricting plan for the State House in 2001, the Legislative Redistricting Board drew the map. PL’s Ex. 148, at 2 (Solomons’ Pre-fíled Testimony). Avoidance of this default process was important to the State House in 2011. Id.
171. On February 17, 2011, the U.S. Census Bureau released redistricting data from the 2010 Census to Texas. During *230 the 82nd Legislature, which met between January and May 2011, the State House took up redistricting based upon population numbers from the 2010 U.S. Census. The Texas Legislature did not begin the actual map-drawing process until the U.S. Census Bureau released block-level population data. Pl.’s Ex. 35, at 26.
172. The redistricting plan for the State House contained in House Bill 150 (the “State House Plan”) is the redistricting plan for which Texas seeks preclearance.
A. Map-Drawing Process
173. Speaker of the State House Joe Straus appointed Representative Burt Solomons, who represents HD 65, to chair the State House Redistricting Committee. Straus Dep. 63-64, Oct. 24, 2011. Chairman Solomons had never before chaired a redistricting committee, PL’s Ex. 148 at 1 (Pre-filed Testimony of Chairman Burt Solomons), and had “no background in redistricting.” Trial Tr. 65, Jan. 20, 2012 PM (Chairman Solomons).
174. Speaker Straus did not give Chairman Solomons any specific instructions other than to prepare a map that would be supported within the State House. Straus Dep. 63-64, Oct. 24, 2011.
175. Chairman Solomons spent no time learning anything about the VRA or Texas’s obligations thereunder, and was entirely reliant on legislative staff members (Ryan Downton, Gerardo Interiano, and the TLC) and the OAG throughout the redistricting process. Trial Tr. 65-66, Jan. 20, 2012 PM (Chairman Solomons).
176. Mr. Interiano was the principal mapdrawer for the State House Plan. Trial Tr. 127-32, Jan. 17, 2011 AM (Interiano).
177. Members provided Mr. Interiano with proposed maps for their districts and it was his responsibility to put the pieces together to create the 150-district map. Trial Tr. 132, Jan. 17, 2012 AM (Interiano). Mr. Interiano worked with Members on drawing and redrawing their districts. Trial Tr. 105, Jan. 25, 2012 PM (Interiano).
178. Mr. Interiano understood from both Speaker Straus and Chairman Solomons that one major goal behind the State House Plan was “to give members the opportunity to be reelected.” Trial Tr. 160, Jan. 17, 2012 AM. Additionally, he was tasked by Speaker Straus to pass a legal map; ensure that map-drawing was a member driven process; and pair the least number of Members to run against each other in re-drawn or new districts. Id. at 133-34.
179. Mr. Downton’s role in the process was to assist Members in drawing maps and to help mediate disagreements. Trial Tr. 46, Jan 18, 2012 AM (Downton).
180. Speaking on the floor of the State House, Chairman Solomons told the Members in early 2011 that he wanted the redistricting process to be a member-driven process, which meant that he wanted the Members to draw their own districts. PL’s Ex. 148 at 3.
181. As a result, redistricting was in large measure left to the State House Members without, as far as the record reveals, any instruction on or attention to the State’s obligations under the VRA or its history of discrimination in voting. The process promoted Members’ self-interest in reelection — with Republicans preferred by the Republican House majority — ahead of all other considerations for redistricting. See, e.g., infra ¶¶ 240, 249, 258.
182. Chairman Solomons never addressed, or contemporaneously even knew, the number of minority districts protected by the VRA under the Benchmark Plan. *231 Trial Tr. 61-62, Jan. 20, 2012 PM (Solomons). There is no evidence that any other legislator was any better informed. Speaker Straus relied on Chairman Solomons and staff to assure him that the State House Plan was compliant with the VRA. Straus Dep. 71, Oct. 24, 2011. Likewise, Chairman Seliger in the State Senate relied on assurances from Chairman Solomons that the State House Plan complied with the VRA. Trial Tr. 33-34, Jan. 24, 2012 AM (Chairman Seliger).
183. When issues concerning the VRA arose, Mr. Interiano and/or Mr. Downton would usually make any necessary decision, but they went to the political leadership on critical issues. Trial Tr. 99, Jan. 25, 2012 PM (Interiano) (“[I]n the vast majority of the process of drawing, the decision was made by the staff.... [W]hen it was a decision that we were not comfortable making[,] we would take [it] to [Chairman Solomons and Speaker Straus].”).
B. Redistricting Principles
184. It is a requirement of Texas law that a candidate live in the State House district from which s/he is running for election. Trial Tr. 166, Jan. 17, 2012 AM (Interiano). This requirement resulted in strangely-shaped new districts, such as HD 41 (known as the “Transformer” because of its abrupt angles) in which lines were carefully drawn to include the home of Representative Aaron Pena and to exclude the home of Representative Veronica Gonzales so that the two incumbents would not have to run against each other. Id.
185. Based on the State’s population of 25,145,561 people in 2010, State House districts with perfectly equalized population would each contain 167,637 residents. Pl.’s Ex. 35 at 15. A ten percent total population deviation from 167,000 individuals per State House district was acceptable in redistricting. Trial Tr. 1473-74, Perez v. Perry, Sept. 12, 2011 (Interiano); Trial Tr. 149, Jan. 17, 2012 AM (Interiano).
186. The County Line Rule greatly shaped the State House Plan. It stems from Section 26, Article 3 of the Texas State Constitution, which provides that State House districts must be apportioned within counties “as nearly as may be” according “to the most recent United States Census.” Tex. Const., art. Ill, § 26. The mapdrawers first divided the total population of the State into 150 districts and then assigned the appropriate number of districts to each county. They interpreted the County Line Rule to mean that as many whole districts as possible must be drawn within a county and that any surplus population must be wholly joined with other counties or with whole surpluses from other counties to form a district. Trial Tr. 143-45, Jan. 17, 2012 AM (Interiano); PL’s Ex. 9. Adherence to the County Line Rule was the explanation offered for the elimination of Hispanic ability districts. Trial Tr. 147, Jan. 17, 2012 PM (Interiano); see infra § E(a).
187. Where all proposed State House districts in a county were projected to be wholly contained within the county lines, the affected State House Members drew their own maps because any changes did not affect the rest of the State House Plan. Those counties were “dropped-in” to the overall redistricting map. Trial Tr. 46-47, Jan. 18, 2012 AM (Downton). El Paso, Dallas, Tarrant, Denton, Bexar, Travis, Nueces, and Harris Counties were treated as drop-in counties. Id. at 48. The process worked smoothly for some counties, but was more difficult in others.
188. Mr. Interiano testified that he used HCVAP and SSVR data to determine that the State House Plan complied with *232 the VRA. Trial Tr. 138-39, Jan. 17, 2012 AM (Interiano).
189. Neither Mr. Interiano nor Mr. Downton even looked at the OAG election analyses until the work was basically done. Trial Tr. 1451-52, Perez v. Perry, Sept. 12, 2011 (Interiano); Trial Tr. 57, Jan. 18, 2012 AM (Downton). There is no testimony that the OAG analyses prompted any changes in the State House Plan after Messrs. Interiano and Downton actually looked at them.
190. The OAG did not identify or analyze districts in which minority voters had the ability to elect a candidate of choice. Giberson Dep. 20-21, Oct. 18, 2011. Using a test of 50.1% or more for an ability district, both Mr. Interiano and Mr. Hanna identified 29 Hispanic ability districts in the Benchmark Plan, and thought this number increased to 30 in the State House Plan because the SSVR of HDs 90 and 148 increased. See Trial Tr. 25-26, 32, Jan. 17, 2012 PM (Interiano); id. at 181, Jan. 17, 2012 AM (Interiano); PL’s Ex. 6.
191. Based upon the testimony at trial, the Court does not find credible or persuasive representations by counsel that election analysis was an important tool to determine whether proposed State House districts would assure minority voters the ability to elect. It is clear that Texas adopted the principle that districts with SSVR above 50.1% were Hispanic ability districts under the VRA. See, e.g., PL’s Ex. 6 (email between Mr. Hanna and Mr. Interiano discussing the number of districts with an SSVR over 50%); Trial Tr. 183, Jan. 17, 2012 AM (Interiano); Trial Tr. 66-68, Jan. 25, 2012 PM (Interiano).
192. Although Mr. Interiano agreed that it would have been possible to draw another Hispanic ability[14] district in the map, he did not do so because “this was a member-driven map [and] we were not going to be asking [members] to make changes unless we believed that it was required by the Voting Rights Act or any other law.” Trial Tr. 35, Jan. 17, 2012 PM (Interiano).
C. Data Available to Draw the Maps
193. Mr. Interiano testified that he spent close to one thousand hours learning the RedAppl software program used for redistricting even before any census results were available. Trial Tr. 131, Jan. 17, 2012 AM (Interiano). He also attended several conferences and read major cases on redistricting. Id. at 130. David Hanna and Jeffery Archer of the TLC contributed legal advice when asked, id. at 134-35, but, according to the record, were frequently ignored.[15]
*233 194. RedAppl has a function that shades a map to indicate the percentage of ethnic (Hispanic) or racial (Black) voting age population in a certain voter tabulation district (“VTD”). As relevant here, RedAppl further disaggregates this data to allow a user to view the variations of voting age population or total population by race or ethnicity at the census block level through color shading. RedAppl also allows a user to view variances in SSVR[16] between VTDs through color shading, but does not show variances in SSVR between census blocks within a particular VTD. Trial Tr. 70, Jan. 25, 2012 PM (Interiano). Similarly, election information, ie. the percentage of population that voted for a certain candidate in a prior election, is only available at the level of a VTD. Trial Tr. 69-71, Jan. 19, 2012 AM (Korbel).
195. Mr. Interiano testified that the State has no specific policy against splitting VTDs when drawing new electoral maps. Trial Tr. 63-64, Jan. 25, 2012 PM (Interiano). As a result, VTDs were split readily in districts like HD 41 in Hidalgo County. Splitting VTDs reduces minority voting, as confusion and lack of language skills causes some minority voters not to vote. Trial Tr. 61-62, Jan. 19, 2012 AM (Korbel) (“[I]t has a disproportionate impact because minority, a great number of minority voters don’t have transportation for example, don’t read ..., aren’t able to read these notices in the newspaper about changes in polling place and it results in a great deal of confusion.”).
196. Mr. Interiano testified that he used shading functions on RedAppl to indicate population by racial or ethnic group very early in the process, but he did not use this function to shade for Hispanic voting age population at the census block level; instead, he only examined Hispanic voting age population at the VTD level. Trial Tr. 86-87, Jan. 25, 2012 PM (Interiano). He further testified that he did not know that the RedAppl software could even show shading for different racial populations at the census block level. Trial Tr. 94, Jan. 17; 2012 PM (Interiano) (“I never did it at the bloc [sic]. I did not know that it was even possible, as I testified in several of my depositions. I did not know that it was possible to do it, and because it was not possible I certainly never tried and never used bloc [sic] racial shading.”).
197. This testimony is not credible and is not accepted by this Court. As demonstrated at trial, when racial/ethnic population shading is used in RedAppl, a drop-down menu gives the user the option to show variances in that demographic between census blocks. Trial Tr. 88-89, Jan. 25, 2012 PM (Interiano). After one thousand hours of training and experience, the Court is confident Mr. Interiano would be aware of this functionality in the software and saw the drop-down menu.
198. Furthermore, it is clear Mr. Interiano knew that using census block data to identify the demographics of voters could *234 advance the goal of maximizing Republican electoral strength by suppressing the minority vote. As previously discussed, in early December 2010, Eric Opiela, counsel to Speaker Straus, suggested to Mr. Interiano that voting and population data might permit distinctions between minorities who turn out heavily to vote and those who do not; with such information, he suggested, districts could be drawn that would retain a large minority population but actually include a much smaller number of minority voters. Defs.’ Ex. 304. Mr. Interiano tried to obtain demographic information on the level of census blocks but learned that only data on “Spanish Surname VR/Total Hispanic Population” was available. Defs.’ Ex. 197. Although he obtained the data and sent it to Mr. Opiela, Mr. Interiano insisted that he never opened the files containing SSVR information on a census block level. Interiano Dep. 69, Jan. 10, 2012. Given the results in some districts, such as CD 23, where low-voting minorities were substituted for politically-active minorities, the Court does not credit this testimony.
199. In addition, the fact that HD 41, a Benchmark ability district, was crafted with 17 VTD splits in the State House Plan, Defs.’ Ex. 886, at 76-77, and the reasons for all of these splits was not explained further leads the Court to discredit this testimony. Trial Tr. 168, Jan. 17, 2012 AM (Interiano).
D. Hearings, Procedures, and Passage
200. The first statewide proposal put forth by the Chairman of the State House Redistricting Committee, known as Plan H113, was released on Wednesday, April 13, 2011. Notice of a public hearing on the plan was provided on that day, and public hearings were held immediately, in Austin, Texas, on Friday, April 15 and Sunday, April 17. No hearings outside Austin were conducted.
201. The House Rules provide for a three-to-five day rule for posting advance notice of hearings. The notice for the April 15th hearing on the HI 13 was posted on April 13, 2011, which resulted in less than two days’ notice. Solomons Dep. 83-85, Aug. 31, 2011. David Hanna advised that the hearing schedule was too tight, but his caution was ignored. Defs.’ Ex. 971, at 2.
202. On Monday, April 18, 2011, it was announced on the floor of the House that the Redistricting Committee would meet on Tuesday, April 19. Defs.’ Ex. 509 at 18. When it met, the House Redistricting Committee passed a plan known as H153 out of Committee.
203. State House Members were given until Monday, April 25, 2011 (the Monday after Easter weekend) to file any amendments to the bill. Trial Tr. 801, Perez v. Perry, Sept. 8, 2011 (Turner).
204. The rushed schedule severely hampered the ability of citizens to attend the two hearings on the bill and of legislators to prepare objections or proposed amendments. See Defs.’ Ex. 738 at 19 (Rep. Hochberg Pre-filed Direct Testimony).
205. On Thursday, April 28, 2011, the State House passed an engrossed version of the plan, H283, in House Bill 150 by a vote of 92-54-3.
206. No changes were made to the State House Plan in the State Senate. Pl.’s Ex. 162, ¶ 5 (Seliger Pre-filed Testimony). Thus, when the Texas Legislature passed House Bill 150 on May 23, 2011, the State House Plan that was adopted was the one drawn by the State House.
207. The Governor signed House Bill 150 into law on June 17, 2011.
*235 E. Alleged Lost Hispanic Ability Districts
a. Nueces County & House District 33
208. The Benchmark contained three House districts in Nueces County: 32, 33, and 34. HD 32 was the only district not fully contained in the county. HD 33 was dropped from Nueces County in the State House Plan. The demographics of the districts containing some part of Nueces County under the Benchmark Plan are as follows:
Benchmark HD HCVAP SSYR
HD 32_35.3% 33.2%
HD 33_60.4% 54.3%
HD 34_58.2% 53.8%
Pl.’s Ex. 13, at 13, 23.
209. Benchmark HD 32 is represented by Representative Todd Hunter, an Anglo Republican. It is only partially in Nueces County and also includes Aransas, San Patricio and Calhoun counties. The majority of voters in HD 32 in general elections are Anglo. Defs.’ Ex. 737, at 11 (Abel Herrero Pre-filed Direct Testimony).
210. Benchmark HD 34 is represented by Representative Connie Scott, an Anglo Republican. It is made up of both urban and rural areas of Nueces County and is a majority Hispanic district. The Hispanic candidate of choice won four out of the past five endogenous elections in HD 34. Defs.’ Ex. 326, at 5 (Handley House Report). It is a district where Hispanic voters have the ability to elect a candidate of their choice in the Benchmark.
211. Benchmark HD 33 is represented by Representative Raul Torres, a Hispanic Republican. It is made up of the historic core of Corpus Christi. Defs.’ Ex. 737, at 8. Hispanic voters are ordinarily the majority of voters in Benchmark HD 33. Id. at 9-10. It is a district where Hispanic voters have the ability to elect in the Benchmark and it no longer provides Hispanic voters the ability to elect in the State House Plan.
212. The voting demographics of Benchmark and enacted HD 33 are as follows:
HD 33_Pod. YAP[17] CYAP HCVAP BCVAP WCVAP SSYR
Benchmark 148,929 109,257 97,255 60.4% 4.5% 33.5% 55.3%
Enacted 172,135 119.518 109,865 8.5% 5.9% 81.2% 6.5%
Pl.’s Exs. 13,14.
213.Hispanic voters were successful in electing their candidate of choice in four of the past five endogenous elections in Benchmark HD 33. Handley House Rep., at 5. In the 2010 election, Representative Solomon Ortiz, the Hispanic candidate of choice, won 47.5% of the vote, but lost to Representative Raul Torres, the current representative of HD 33. Defs.’ Ex. 726 at 6, n. 5 (Engstrom Supp. Rep.).
214.Hispanic candidates of choice won at least 50% of the exogenous elections the *236 experts in this case analyzed in Benchmark HD 33. Handley House Rep. at 5 (five out of five elections); Defs.’ Ex. 799 (“Engstrom Chart”) (four out of seven elections); Pl.’s Ex. 175, at 11, tbl.3b (“Alford Rep.”) (six out of ten elections).
215. According to the 2010 American Community Survey 1-year estimates, Nueces County had a citizen voting-age population of 238,102 persons, including 91,467 Anglos (38.4%) and 133,084 Hispanic persons (55.9%). As a whole, however, Nueces County had an SSVR below 50%. Trial Tr. 9, Jan. 17, 2012 PM. It was allotted 2.03 districts based upon the County Line Rule in the State House Plan. Trial Tr. 147, Jan. 17, 2012 AM (Interiano). The State calculated this number by dividing Nueces County’s population of 340,233 by the ideal district size (167,637). PL’s Ex. 35, at 19.
216. Messrs. Hanna and Interiano decided that Nueces County “needed to have two districts and only two districts” in the State House Plan. Trial Tr. 147, Jan. 17, 2012 PM (Interiano). They informed Chairman Todd Hunter, who represents HD 32, and the rest of the Nueces County delegation of this fact. Id. HD 33, a Hispanic ability district in the Benchmark, was chosen for elimination.
217. Legislative staff drew one district that was a “Latino Democratic” district and one that “would likely be Republican and not Latino.” Defs.’ Ex. 742 (Hanna Dep. 46, Jan. 12, 2012). The core of Benchmark HD 33 is moved into enacted HD 34. Defs.’ Ex. 737, at 13-14. Representative Raul Torres, the current incumbent in Benchmark HD 33, and Representative Connie Scott, the current incumbent in Benchmark HD 34, are the junior Republican members of the Nueces County delegation and are paired under the State House Plan in HD 34, while Representative Todd Hunter is drawn into enacted HD 32 in Nueces County. Trial Tr. 122, Jan. 17, 2012 AM (Rep. Hunter).
218. Mr. Hanna recognized that drawing two districts in Nueces County may have to yield to the VRA. He wrote on April 20, 2011: “While there are two 50% SSVR plus districts within the county currently that may constitute performing Hispanic districts, they are both significantly underpopulated [sic] and the remaining people in Nueces County are predominantly Anglo. The county line rule likely requires two districts to be wholly contained within Nueces County with no surplus coming out; however this would have to yield to the federal Voting Rights Act if it can be shown retrogression could be avoided by splitting the county.” PL’s Ex. 5, at 1. He further advised that splitting the Hispanic population in half would only result in two districts with SSVRs under 50% which were unlikely to perform as “Hispanic districts of choice.” Id. In keeping with the County Line Rule, it was not possible to draw two districts that had an SSVR of above 50% in Nueces County and therefore only one district was drawn with an SSVR of above 50%.[18] Trial Tr. 147, Jan. 17, 2012 AM (Interiano).
219. Mr. Hanna did not know if the loss of a district that “performed” for Hispanic voters in Nueces County was made up somewhere else in the State House Plan. Defs.’ Ex. 742 (Hanna Dep. 46, Jan. 12, 2012). Mr. Interiano testified that he felt that the loss of HD 33 would be accounted for through the increase in SSVR *237 in enacted HDs 90 and 148. Under the Benchmark, neither of these districts had an SSVR above 50%, Trial Tr. 10, Jan. 17, 2012 PM (Interiano), although each was in fact an ability district. See infra § F.
220. In the State House Plan, only HDs 32 and 34 remain in Nueces County, see PL’s Ex. 88, with the following demographics:
Enacted HD HCVAP SSVR ~
HD 32_44.2%_36.6%
HD 34_64,6%_60.1%
PL’s Ex. 14, at 13, 23.
221. The area that makes up Benchmark HD 33 is relocated to Dallas County in the State House Plan. Minority preferred candidates have no success in exogenous elections in enacted HD 33. Handley House Rep. at 9; Alford Rep at 11, tbl.3b; Engstrom Chart.
b. House District 35
222. Benchmark HD 35 is located in southern Texas and contains Atascosa, Karnes, Goliad, Bee, Live Oak, and McMullen counties. Enacted HD 35 loses the counties of Karnes, Goliad, and Jim Wells. It gains San Patricio and Duvall counties.
223. Benchmark HD 35 is a district where Hispanic voters have the ability to elect. It cannot be determined whether minority voters have the ability to elect in HD 35 in the State House Plan.
224. The voting demographics for the Benchmark and enacted HD 35 are as follows:
HD 35_Pop. VAP CVAP HCVAP BCVAP WCVAP SSVR
Benchmark 151,882 113,190 107,735 54.6% 5.3% 38.8% 55.3%
Enacted 172,482 127,314 121,925 52.5% 4.2% 42.0% 53.4%
PL’s Exs. 13,14.
225. The minority candidate of choice won the last four of five endogenous elections in Benchmark HD 35. Handley House Rep., at 5. The current representative of Benchmark HD 35 is Jose Aliseda, a Hispanic Republican, who is not running for re-election. Representative Aliseda is a freshman representative who beat former Representative Yvonne Gonzales, a Democrat, to win the seat in 2010. Trial Tr. 39, Jan 20, 2012 PM (Chairman Solomons). Representative Aliseda was not the candidate of choice of Hispanic voters. Handley House Rep., at 34.
226. The exogenous election results for Benchmark HD 35 show that Hispanic candidates of choice may win approximately half or fewer of the elections analyzed by the experts in this case. See Handley House Rep. at 5 (two out of five elections); Alford Rep. at 11, tbl.3 (five out of ten elections); Engstrom Chart (two out of seven elections). The exogenous election results of the experts vary with respect to their measurement of minority voting strength in enacted HD 35, making these results inconclusive in evaluating the change in minority voting power in enacted HD 35. Handley House Report at 5 (one out of five elections); Alford Rep. at *238 11, tbl.3 (four out of ten elections); Engstrom Chart (three out of seven elections).
227. Representative Aliseda wanted to draw a proposed HD 35 that was more Republican in the State House Plan. Trial Tr. 113, Jan. 17, 2012 PM (Aliseda). He himself proposed a large portion of the map for this district, but he did not receive every area he proposed. Id. He worked with Mr. Interiano on the map and relied on Mr. Interiano’s advice regarding the manner in which the district needed to be drawn. Id. at 111, 113, 118. He understood that, due to the VRA, he needed to keep the Hispanic population in HD 35 at current percentages. Id. at 122.
c. House District 117
228. Both the Benchmark and enacted HD 117 are wholly located within Bexar County. HD 117 shares its eastern border with HD 118 in both the Benchmark and State House Plans.
229. HD 117 is a Hispanic ability district in the Benchmark, but Hispanic voters lose the ability to elect in this district in the State House Plan.
230. The Hispanic candidate of choice won three out of five of the last endogenous elections in Benchmark HD 117. Defs.’ Ex. 326, at 5 (Handley House Rep.).
231. HD 117 is currently represented by John Garza, a Hispanic Republican and a freshman representative in the State House who defeated Representative David Liebowitz, an Anglo Democrat, by a very close margin in 2010. Representative Garza is not the Hispanic candidate of choice. Handley House Rep. at 34. The Hispanic candidate of choice, Representative Liebowitz, won 48.1% of the vote in 2010. Id. at 34; Engstrom Supp. Rep. at 7.
232. HD 118, which lost some area to HD 117 in the State House Plan, is currently represented by Representative Jose Farias, a Hispanic Democrat.
233. The exogenous election results for Benchmark HD 117 show that Hispanic citizens are successful in electing their candidate of choice at least 50% of the time. See Alford Rep., at 11, tbl.3b (five out of ten elections); Handley House Rep., at 5 (three out of five elections); Engstrom Supp. Rep., at 6 (four out of seven elections). In enacted HD 117, the exogenous results show that minority effectiveness in such elections will drop; in particular, Dr. Alford and Dr. Handley’s analyses both show decreases of at least 30% in exogenous election results in the enacted district. Alford Rep., at 11, tbl.3 (two out of ten elections); Handley House Rep., at 11 (one out of five elections); see also Engstrom Supp. Rep., at 8-9 (three out of seven elections).
234. The voting demographics for Benchmark and enacted HD 117 are as follows:
HD 117_Pop. YAP CYAP HCVAP BCVAP WCVAP SSVR
Benchmark 220,360 155,490 106,595 58.8% 6.1% 32.3% 50.8%
Enacted 171,249 116,261 71,395 63.8% 4.6% 29.4% 50.1%
*239 Pl.’s Exs. 13,14.
235. The Bexar County Delegation, made up of seven Democrats and three Republicans, met as a whole to decide how to redistrict the County. Trial Tr. 105, Jan. 25, 2012 PM (Interiano). Representative Mike Villarreal, a Hispanic Democrat, and Representative Ruth McClendon, a Black Democrat, led the process. Defs.’ Ex. 363 (Garza Dep. 25, Oct. 19, 2011). Mr. Interiano was present at meetings where the delegation discussed how to draw the new map. Id. at 28; Trial Tr. 105, Jan. 25, 2012 PM (Interiano).
236. Mr. Interiano described the process for drawing the Bexar County map as one where all of the Members proposed their ideal district to Representative Villarreal, who put the districts together in a map that showed where requests overlapped. The Members then negotiated to determine who would receive specific parts of the map. Trial Tr. 107, Jan. 25, 2012 PM (Interiano). Nine out of ten Members from the Bexar County delegation approved the districts for the County. Trial Tr. 105, Jan. 25, 2012 PM (Interiano). Representative Farias did not agree.
237. Mr. Interiano’s goal in drawing enacted HD 117 was to keep its SSVR above 50%. Trial Tr. 159, Jan. 17, 2012 AM (Interiano). Mr. Interiano told Representative Garza that he needed to keep his district above a 50% SSVR and “maintain [his] other goals in the district.” Trial Tr. 107, Jan. 25, 2012 PM (Interiano).
238. Representative Garza said that he did not have much control and that the delegation agreed on the map for Bexar County on a consensus basis. Defs.’ Ex. 363 (Garza Dep. 69, Oct. 19, 2011). He said that he wanted his district to move northward, where the area was more Anglo and more Republican. Id. at 30-31. And while he testified that he did not identify any specific areas that he wanted in his district, id. at 33, he then said that he wanted to keep Port San Antonio, the University of Texas at San Antonio, and Lackland Air Force Base in his district. Id. at 34-35.
239. Representative Garza was aware that minority representation had to be maintained in HD 117. Defs.’ Ex. 363 (Garza Dep. 26, Oct. 19, 2011). He was advised by both the OAG and Representative Villarreal that he could not move his district northward and that he had to continue to keep certain indicators of Hispanic voting strength the same as in the Benchmark district. Id. In his deposition, Representative Garza could not identify those specific indicators, id. at 51, although contemporaneously he told Representative Farias that he had to have an SSVR of 50.1% in his enacted district. Trial Tr. 14-15, Jan. 24, 2012 PM (Rep. Farias).
240. The mapdrawers thus decided to maintain SSVR levels while minimizing the actual Hispanic vote so that Representative Garza, as a Republican, could be reelected. Part of the attention to this issue is revealed by a March 24, 2011 email from Representative Villarreal to Mr. Interiano containing a chart stating that “[o]f the 27 VTD’s won by Garza, 4 had a majority of SSRV.”[19] Defs.’ Ex. 917, at 3.
241. In order to accomplish this goal, the communities of Somerset and Whispering Winds were moved from Representative Farias’s district to Representative Garza’s district. Somerset is a rural, minority community with low Hispanic voter turnout. Defs.’ Ex. 363 (Garza Dep. 39-40, Oct. 19, 2011). Whispering Winds is another largely, Hispanic community with low voter turnout. Trial Tr. 13, Jan. 24, 2012 PM (Farias).
*240 242. Both Somerset and Whispering Winds are very poor communities that have poor water quality and poor housing. Farias Dep. 25, Jan. 5, 2012. As a result, Representative Farias paid special attention to the needs of these communities and was working actively to improve both. Trial. Tr. 9-11, Jan. 24, 2012 PM (Farias). He was very concerned that he continue to represent both communities. Trial Tr. 7-8, Jan. 24, 2012 PM (Rep. Farias).
243. Despite Representative Farias’s strong objections, Whispering Winds and Somerset were drawn into HD 117, Representative Garza’s district. Trial Tr. 8, 23, Jan. 24, 2012 PM (Rep. Farias).
244. Representative Villarreal proposed taking Somerset and Whispering Winds out of Representative Farias’s district, Trial Tr. 24, Jan. 25, 2012 PM (Rep. Farias), at the behest of Speaker Straus to ensure Representative Garza’s reelection. Farias Dep. 26, Jan. 5, 2012.
245. Mr. Interiano admitted that the “political numbers” of Representative Garza’s benchmark district meant that Representative Garza could not be reelected if Somerset were not included in his district in the State House Plan. In order to maintain “demographic [ie. SSVR] and political numbers” for his reelection, Somerset was a necessary addition. Trial Tr. 160, Jan. 17, 2012 AM (Interiano).
246. Because Representative Farias’s goal was to keep the communities of Somerset and Whispering Winds in HD 118, he asked Representative Garza to take South San Antonio Independent School District (“ISD”) from HD 118 in exchange for allowing Somerset and Whispering Winds to remain in his district. Trial Tr. 15-16, Jan. 25, 2012 PM (Rep. Farias). Notably, South San Antonio ISD had a very high voter turnout as compared to Somerset and Whispering Winds. Trial Tr. 17, Jan. 24, 2012 PM. Representative Garza refused to make the trade. Id. at 16-18.
247. Representative Farias also visited with Mr. Interiano and Speaker Straus, unsuccessfully, in his effort to keep Whispering Winds and Somerset in his district. Trial Tr. 14, Jan. 24, 2012 PM (Rep. Farias).
248. Representative Farias ultimately offered an amendment on the floor of the State House to allow Whispering Winds to stay in his district in exchange for moving the area around Lackland Air Force Base to Representative Garza’s district. Trial Tr. 17, Jan. 24, 2012 PM (Rep. Farias); Defs.’ Ex. 323, at 36. Representative Garza said he would leave the Amendment to the will of the House. Trial Tr. 17, Jan. 24, 2012 PM (Rep. Farias).
249. During the House discussion of Representative Farias’s amendment, Representative Aliseda expressed concerns regarding what it would do to the “Republican numbers” of Representative Garza’s new district. Defs.’ Ex. 323, at 36.
250. Representative Farias was unsuccessful in passing his amendment and the communities of Somerset and Whispering Winds are in HD 117 in the State House Plan.
d. House District 41
251. Representative Veronica Gonzales, a Hispanic Democrat, currently represents Benchmark HD 41 in Hidalgo County. Representative Aaron Pena, a Hispanic Republican, currently represents Benchmark HD 40, immediately adjacent to HD 41 in Hidalgo County. Representative Pena is a five-term incumbent who switched political affiliation from Democrat to Republican at the end of 2010. Trial Tr. 163, Jan. 17, 2012 AM (Interiano).
*241 252. Both Benchmark enacted HD 41 are a Hispanic ability districts.
253. In Benchmark HD 41, the Hispanic candidate of choice was elected in five out of five of the past endogenous elections. Handley House Rep., at 4. Furthermore, in Benchmark HD 41, the minority candidate of choice wins the exogenous elections the experts analyzed over 50% of the time. Handley House Rep., at 5 (four out of five elections); Alford Rep., at 11 tbl.3 (seven wins out of ten elections); Engstrom Chart (five out of seven elections).
254.The demographics of Benchmark and enacted HD 41 are as follows:
HD 41 Pop. VAP CVAP HCVAP BCVAP WCVAP SSVR
Benchmark 185,892 125,055 86,940 77.5% 0.9% 20.2% 69.2%
Enacted 160,238 111,689 79,770 72.1% 0,9% 25.3% 64.6%
Pl.’s Exs. 13,14.
255. According to the 2010 American Community Survey 1-year estimates, Hidalgo County, Texas had a citizen voting-age population of 363,615 persons, including 48,087 Anglos (13.2%), and 309,690 Hispanics (85.2%).
256. Mr. Interiano drew all of the proposed State House districts in Hidalgo County. Trial Tr. 1426, Perez v. Perry, Sept. 12, 2011 (Interiano). He first drew HD 41, id. at 1476-77, with the objective of boosting Representative Pena’s chances for reelection. Trial Tr. 165, Jan. 17, 2012 AM (Interiano).
257. Mr. Interiano knew when he drew enacted HD 41 that it would have to be a majority-Hispanic district because it was impossible to draw a district that was not majority-minority in Cameron or Hidalgo counties. Trial Tr. 42-43, Jan. 17, 2012 PM (Interiano).
258. In the process of drawing the map for HD 41, Mr. Interiano split 17 VTDs. Defs.’ Ex. 886, at 76-77. VTDs were cut in order to avoid pairing incumbents, allow Representative Pena’s house to be moved into enacted HD 41, and to cut out heavily Democratic areas “because [mapdrawers] wanted to increase the [sic] Republican performance of that district.” Trial Tr. 168, Jan. 17, 2012 AM (Interiano); Defs.’ Ex. 785 (Pena Dep. 160-61, Oct. 19, 2011). Many splits, however, were not specifically explained. Over 31% of the population of enacted HD 41 was drawn into the district from split VTDs. Handley House Report, at 9.
F. New Hispanic Ability Districts
a. Alleged New Hispanic Ability Districts
i. House Districts 90 & 148
259. Mr. Interiano specifically testified that the loss of HD 33 was made up in part by the increased SSVR in enacted HDs 90 and 148. Trial Tr. 10, Jan. 17, 2012 PM (Interiano). Both of these districts are Hispanic ability districts in the Benchmark and remain so in the State House Plan.
260. Representative Jessica Farrar, a Hispanic Democrat, represents Bench *242 mark HD 148, located in Harris County. Representative Lon Burnam, an Anglo Democrat, represents Benchmark HD 90, located in Tarrant County.
261.The voting demographics for Benchmark and enacted HD 148 are as follows:
HD 148 Pop. VAP CVAP HCVAP BCVAP WCVAP SSVR
Benchmark 140,946 109,647 79,785 42.1% 10,0% 45.4% 40,0%
Enacted 175,324 126,854 86,715 51.4% 9.4% 37.0% 50.0%
Pl.’s Exs. 13,14.
262.In Benchmark HD 148, the Hispanic candidate of choice won five out of five of the past endogenous elections. Handley House Rep. at 5. The Hispanic candidate of choice also won all of the exogenous elections the experts analyzed in this case. Id. at 5; Engstrom Chart. These results do not change in the enacted State House Plan. Handley House Rep., at 11; Engstrom Chart.
263.The voting demographics for Benchmark and enacted HD 90 are as follows:
HD 90_Pop. VAP CVAP HCVAP BCVAP WCVAP SSVR
Benchmark 141,349 97,594 62,045 47.9% 12.6% 37.2% 47.2%
Enacted 159,428 105,582 67,570 49.7% 15.6% 32.5% 50.1%
PL’s Exs. 13,14.
264. In Benchmark HD 90, the Hispanic candidate of choice won five out of five of the past endogenous elections. Handley House Rep. at 5. In Benchmark HD 90, the Hispanic candidate of choice also won all of the exogenous elections the experts analyzed. Id.; Engstrom Chart. These results do not change in the State House Plan. Handley House Rep., at 11; Engstrom Chart.
265. Other than Mr. Interiano’s testimony at trial, there is no evidence that the decision to increase the SSVR in these two districts was intended to offset the loss of HD 33. Instead, it appears that HDs 90 and 148 were drawn with SSVRs at or above 50% in the State House Plan at the request of MALDEF. Trial. Tr. 10, Jan. 17, 2012 PM (Interiano). Luis Figueroa of MALDEF testified at a Redistricting Committee Hearing and requested this change.[20] Id.
266.Mr. Interiano never determined whether HDs 90 and 148 are Hispanic ability districts in the Benchmark. Defs.’ Ex. 779A (Interiano Dep. Vol. 1, 151-53, Aug. 2, 2011). However, he decided that both districts are ability districts in the State House Plan because their SSVR increased above 50%. Id. at 153.
*243 267. Mr. Interiano explained that he did not do an election analysis of HD 90 because “[i]t was going to perform ten out of ten, and it performed ten out of ten because it was a Democrat [sic] district, not because it was a district that was always electing the candidate of choice of the Latino community.” Trial. Tr. 14, Jan. 17, 2011 PM (Interiano). Similarly, Mr. Interiano did no analysis of HD 148 to determine whether it was or would become a Hispanic ability district. Id. at 32.
268. Mr. Interiano based some of his assessment of enacted HD 90’s effectiveness for minority voters on politics. Mr. Interiano believed Hispanic voters would be able to elect their preferred candidate in enacted HD 90 because the sitting representative, Lon Burnam, opposed the increase in SSVR in this district, while MALDEF supported it. Trial. Tr. 12-13, Jan. 17, 2012 PM (Interiano).
ii. House District 74
269. Benchmark HD 74 encompasses the counties of Uvalde, Edwards, Val Verde, Terrell, Pecos, Brewster, Presidio, Jeff Davis, Ward, Reeves, Loving, Culberson, and Hudspeth. Enacted HD 74 combines Hudspeth, Culberson, Loving, Jeff Davis, Reeves, Presidio, Brewster, Pecos, Terrell, Val Verde, Kinney and Maverick counties.
270. Benchmark HD 74 is a Hispanic ability district.
271. Benchmark HD 74 is represented by Representative Pete Gallego, a Hispanic Democrat, who has represented this district since 1991. Representative Gallego is running for Congress in CD 23 in 2012 and he does not plan to run for reelection to the State House. Pl.’s Ex. 10. It is uncontested that he has been the candidate of choice of Hispanic voters.
272. Mr. Interiano testified that he believed that HD 74 was a Hispanic opportunity district in the Benchmark. Trial Tr. 25, Jan. 17, 2012 PM (Interiano).
273. The demographics for Benchmark and enacted HD 74 are as follows:
HD 74_Pop. VAP CVAP HCVAP BCVAP WCVAP SSVR
Benchmark 143.566 104,522 85,920 59.7% 1.8% 36.7% 58.1%
Enacted 162,357 115,236 86,210 69.4% 1.5% 27.2% 69.6%
Pl.’s Exs. 13, 14.
274. The exogenous election results of the experts in this case for Benchmark HD 74 vary with respect to their measurement of minority voting strength. Alford Rep. at 11 (reporting minority victories in four of ten elections); Handley House Rep. at 5 (one out of five elections); Engstrom Chart (four out of seven elections).
iii. Failure to Draw Additional Hispanic Ability Districts
275. Mr. Interiano thought that that there did not need to be an additional Hispanic ability district in the State House Plan because it was a Member-driven map. As a result, if the Members did not add such districts, he would not ask them to make changes. He felt comfortable with this decision because he believes that the State House Plan is legal under the VRA. Trial Tr. 35, Jan. 17, 2012 PM (Interiano). However, Mr. Interiano did admit that it ■was possible to draw another majority-Hispanic district, which he would classify as an “opportunity” district in Southern Texas in the Rio Grande Valley.
276.In this area of the State, the State House Plan continues to maintain two State House districts in Cameron County and spills its excess population northward *244 into a district shared with Willacy and Kennedy Counties. PL’s Ex. 14, at 1. It also maintains four districts in Hidalgo County and spills its excess population towards Starr County to form another district. Id.
277. Mr. Interiano testified it was possible to use excess population from Cameron and Hidalgo counties to create a majority Hispanic district in the State House Plan that likely would have performed as a Hispanic “opportunity”[21] district. Trial Tr. 42, Jan. 17, 2012 PM (Interiano).
278. If such a district were drawn, then a ripple effect would have caused a county line split in the northern portion of the map around Nueces County. The TLRTF submitted such a proposal. Trial Tr. 39-40, Jan. 17, 2012 PM (Interiano). Due to the violation of the County Line Rule that would result if the populations from the two districts were spilled towards each other, another majority-Hispanie district was not created in this area in the State House Plan. Id. at. 40.
279. Chairman Solomons was aware that there was excess population in both Cameron and Hidalgo Counties, but testified that he never realized that a district could have been created using these populations because his staff did not advise him of that fact. Trial. Tr. 76-77, Jan. 20, 2012 PM (Chairman Solomons).
280. Though population is available to draw a potential new Hispanic opportunity district, the State did not choose to do that nor does it argue that any other new potential Hispanic opportunity/ability district was drawn in the State House Plan.
281. There are no new Hispanic ability districts in the State House Plan.
H. Lost Coalition District: House District 149
282. Benchmark HD 149 is in Harris County, but is eliminated from the County in the State House Plan.
283. HD 149 is a district where a coalition of Asian-American, Black, and Hispanic voters have the ability to elect and its elimination from Harris County in the State House Plan leads to the loss of a minority ability district.
284. Hubert Vo, a Vietnamese-American Democrat, is the representative of Benchmark HD 149. Mr. Vo was elected in 2004 and is the only Vietnamese-American in the State House.
285. The voting demographics of Benchmark and enacted HD 149 are as follows:
HD 149 Pop. VAP CVAP HCVAP BCVAP WCVAP Asian __CVAP
Benchmark 169,836 123,771 90,245 19.0% 26.1% 37.6% 16.2%
Enacted 164,376 116,361 98,445 12.9% 4.4% 77.4% 3.8%
PL’s Exs. 13,14.
286.Benchmark HD 149 contains the community of Alief, a large Asian-American population in the Houston area. Defs.’ Ex. 736, at 5-6, 8 (Rogene Calvert Prefiled Testimony).
287.In general, a review of election results from the OAG 10 shows that Hispanic and Black voters uniformly prefer different candidates from Anglo voters in HD 149 in general elections and that vot *245 ing is racially polarized in this district. Pl.’s Ex. 26, at 3557-60.
288. Asian-Americans, Hispanics, and Blacks in the area of HD 149 often work together to support candidates in local elections and Asian-American candidates have successfully been elected to school boards in Alief and to the Houston City Council. Defs.’ Ex. 736, at 12.
289. In particular, Hispanic, Black, and Asian-American communities came together to help to elect Representative Vo. Defs.’ Ex. 736, at 11. Mr. Vo received endorsements from the Tejano Democrats and the African Coalition for his candidacy in 2004. Id. Representative Hochberg, the Democratic representative from HD 137, testified that Hispanics, Blacks, and Asian-Americans form a coalition in HD 149, with the Asian-American community acting as the glue for this coalition. Defs.’ Ex. 738, at 13. Representative Vo has had a very diverse base of volunteers working on his campaigns, including Asian-American, Hispanic, and African-American volunteers. Id. at 13; Defs.’ Ex. 736, at 11.
290. Mr. Vo would not have been successful in his bid for election if he had not received support from all of the minority communities in HD 149. Defs.’ Ex. 736, at 11. In particular, the Asian-American community has taken a great deal of pride in Representative Vo’s election and many Asian-Americans turned out to vote for him who had not before participated in elections. Id.
291. Because Harris County went from 25 districts in the Benchmark to 24 in the State House Plan, one fewer district was available. HD 149 is eliminated from Harris County and Representative Scott Hochberg and Representative Vo are paired in enacted HD 137 in the State House Plan. Enacted HD 137 contains only one VTD that Representative Vo previously represented. Defs.’ Ex. 738, at 20. Representative Hochberg understands that enacted HD 137 was drawn to give him a chance to win the district, not Representative Vo. Id. at 21.
292. The decision to decrease the number of districts in Harris County was based upon 2010 census data. Dividing Harris County’s population of 4,092,459 by the ideal district size (167,637) yielded 24.4126 districts for the County.[22] Pl.’s Ex. 35, at 20; Trial Tr. 148, Jan. 17, 2012 AM (Interiano).
293. Members of the minority community regarded the decision to eliminate this minority ability district as detrimental to minority voting interests and strength. Leaders of the Texas Asian American Redistricting Initiative, MALDEF, and the NAACP in Houston sent Chairman Solomons a letter protesting the elimination of HD 149. The letter highlighted that the State House Plan would break up the community of interest in Alief. Defs.’ Ex. 632.
294. Mr. Hanna of the TLC concluded that either 24 or 25 districts would be permissible in Harris County, but he thought the choice to draw 24 districts in Harris County was “absolutely defensible.” Defs.’ Ex. 742 (Hanna Dep. 106, Jan. 12, 2012).
295. Initially, Chairman Solomons had stated on the floor of the State House that there would be 25 districts in the enacted Harris County map. Trial Tr. 43, Jan. 19, 2012 PM (Coleman); Defs.’ Ex. 738, at 15. Mr. Interiano told Representative Wayne Smith, an Anglo Republican, and Representative Senfronia Thompson, a Black Democratic from Harris County, to draw *246 maps for Harris County that had both 24 and 25 districts. Trial Tr. 148, Jan. 17, 2012 AM (Interiano). It was generally understood that Representative Smith would lead the redistricting effort in Harris County. Defs.’ Ex. 738, at 15.
296. Between March and April of 2011, Representative Smith and Representative Thompson worked with the whole Harris County delegation on a 25-member map. Trial Tr. 46-48, Jan. 19, 2012 PM (Coleman).
297. Chairman Solomons later told Representative Smith, however, that the Harris County map would only have 24 districts. Representative Smith then drew a 24-district version of the Harris County map that merged Representative Vo and Representative Hochberg’s districts. Smith Dep. 22-23, 37, 38, Oct. 13, 2011. Mr. Interiano provided instruction to the delegation on which districts could be eliminated. He testified: “If the courts would have found or do find that coalition district[s] are protected by the Voting Rights Act, then we believed that the district that was going to most likely be protected by the Voting Rights Act was Scott Hochberg’s district. As a result, ... we instructed the Harris County delegation ... that the demographics of that district, that was the combination of Hochberg and Vo, needed to more closely assemble [sic] Mr. Hochberg’s district rather than Mr. Vo’s.” Trial. Tr. 153, Jan. 17, 2012 AM (Interiano).
298. Representative Smith sent the 24r-district version of the map to Speaker pro tem of the State House, Beverly Woolley. Smith Dep. 34-35, Oct. 13, 2011. Speaker Woolley separately worked on a map that had 24 districts, which she presented to the State House Redistricting Committee. Trial Tr. 46-48, Jan. 19, 2012 PM (Coleman). All of the Republican members of the Harris County delegation signed off on Speaker Woolley’s map, which she then showed to Mr. Interiano. Woolley Dep. 17, Oct. 13, 2011. Democratic members of the Harris County delegation objected to the decision to decrease the number of districts in Harris County. Trial Tr. 150, Jan. 17, 2012 AM (Interiano). Speaker Woolley’s map ultimately was the basis for the way that Harris County was drawn in the State House Plan. Trial Tr. 52, Jan. 19, 2012 PM (Coleman).
299. Mr. Hanna told Mr. Interiano that he felt that a coalition district composed of three different minority groups would be novel. Trial Tr. 30-31, Jan. 17, 2012 PM (Interiano). Nonetheless, he thought that both Representative Hochberg’s and Representative Vo’s districts fell “into [a] potential coalition district situation.” Defs.’ Ex. 742 (Hanna Dep. 39, Jan. 12, 2012). Indeed, Mr. Hanna advised Mr. Interiano via email on February 17, 2011 that cutting Harris County down to 24 seats would lead to two Republicans being paired because all of the Democratic seats constituted “minority” seats. Defs.’ Ex. 293.
300. In Mr. Interiano’s estimation, neither Representative Vo’s district (HD 149) nor Representative Hochberg’s district (HD 137) could be classified as a coalition district within his understanding of the term. Interiano Dep. 46-47, Jan. 10, 2012. However, he realized there was a chance that Benchmark HD 137 might be protected because the district is majority-minority based upon the population of two minority groups whereas Benchmark HD 149 is majority-minority based upon the combination of three minority groups. Trial Tr. 30-31, Jan. 17, 2012 PM (Interiano).
I. Other Disputed Districts
a. House District 26
301. Benchmark HD 26 is located in Fort Bend County and is represented by Charlie Howard, an Anglo Republican. Enacted HD 26 is also located in Fort *247 Bend County and continues to share a border with Benchmark HD 149.
302. The voting demographics of enacted and benchmark HD 26 are as follows:
HD 26 Pop. VAP CVAP HCVAP BCVAP Asian WCVAP SSVR __CVAP_
Benchmark 180,729 133,838 108,536 10.5% 12.6% 22,2% 53.5% 9.7%
Enacted 160,091 117,247 86,950 11.6% 10.6% 19.6% 57.3% 10.3%
Pl.’s Exs. 13,14.
303. No election analysis regarding this district was offered to the Court.
b. House District 106
304. Benchmark HD 106 is located in Dallas County and is represented by Representative Rodney Anderson, an Anglo Republican. Enacted HD 106 is relocated out of Dallas County.
305.The voter demographics of Benchmark and enacted HD 106 are as follows:
HD 106_Pop, VAP CVAP HCVAP BCVAP WCVAP SSVR
Benchmark 159,716 110,146 81,165 29.0% 12.8% 52.0% 23.6%
Enacted 161,947 110,568 74,515 8.8% 6.5% 80.1% 7.6%
PL’s Exs. 13,14.
306. No election analysis was offered to the Court regarding this district.
c. House District 144
307. House District 144 is currently represented by an Anglo Republican and is not a minority-majority district in terms of citizen voting age population. PL’s Ex. 13.
308. Minority preferred candidates do not win endogenous elections in this district. Handley House Report, at 5 (zero out of five elections); Engstrom Chart (zero out of five elections).

. As my colleagues note, Texas and the Texas Latino Redistricting Task Force argue that benchmark CD 25 is not an ability district under section 5. In addition, the United States and its expert, Dr. Handley, do not argue that benchmark CD 25 is a protected district. Indeed, the United States explicitly noted in its post-trial briefing that, in its view, retrogression in the Congressional Plan is based on the failure to add an additional ability district, "not on a ... determination that benchmark [CD] 25 provides minority voters with the ability to elect preferred candidates of choice.” U.S. Post-Trial Br. 16 n. 9.

. CD 25 is, in fact, a combination of a potential coalition district (because Blacks and Hispamos band together) and a potential crossover district (because that joint minority group combines with Anglos to elect its candidate of choice). Even if there were only one minority group in the district, however, my analysis would yield the same result. If CD 25 were 35% Hispanic, for example, I would still conclude based on this record that it was not an ability district. For that reason, I do not assess the possible impact that a multiethnic coalition within a crossover district might have on the ability-to-elect inquiry. My colleagues, who hold the district is protected, do not address this issue either. Rather, they treat the Black and Hispanic communities as a single minority group for purposes of their crossover district analysis, with no explanation why such aggregation is permissible under section 5.

. My colleagues note that the VRA "charges the Court, quite simply, with assessing whether minority voters are able effectively to elect their preferred candidates.” CD 25 Majority Op. at 182 n. 5. But the majority’s "effectively exert” test, just like the statute’s "ability to elect” language, is not self-defining. As we noted above, the Supreme Court has never directly addressed the test to determine ability to elect in the context of crossover districts. Majority Op. at 147-48. Nevertheless, to the extent the Court has spoken to the issue in previous cases, we must look to those precedents for guidance.

. My colleagues argue that leadership requires that minority voters "eschew any 'trade' or compromise in power sharing,” CD 25 Majority Op. at 182 n. 5, but leaders can (and good leaders often do) trade at times without relinquishing their position at the head of a coalition. Trading alone, however, is not enough; minority voters must also “pull” and "haul.” The Supreme Court case my colleagues and I both cite for this point reads "pull, haul, and trade,” De Grandy, 512 U.S. at 1020, 114 S.Ct. 2647 (emphasis added) — and both "pull” and "haul” imply taking the lead. My colleagues' critique isolates "trade” both from its immediate context and from the balance of Supreme Court precedent, which supports a test that requires minority voters to take a more active role in a coalition than simply being "effective.”

. As a preliminary matter, my colleagues place much faith in Dr. Alford's statement that benchmark CD 25 is a district in which minorities have an ability to elect. But as we have already explained at length, Majority Op. at 144-48, Dr. Alford uses a metric that determines ability to elect by degree — a metric we have emphatically rejected. There is no reason that his assessment should be legally conclusive for this district, yet no other. My colleagues respond that the burden of proof is on Texas, and "its only expert credibly opined ... that Benchmark CD 25 is an ability district.” CD 25 Majority Op. at 181 n. 4. But Texas did not concede benchmark CD 25's ability status. See, e.g., Pl.’s Mem. Concerning Congressional District 25, at 1 ("[Ujnless all Democratic districts are ipso facto ability districts, no minority group in benchmark CD 25 had the ability to elect candidates of their choice.”). That Texas’s expert uses the word "ability” in his assessment of benchmark CD 25 does not mean that he was offering a legal opinion on its protected status, properly defined, contrary to the State’s position. As we agreed in the opinion, Dr. Alford has a different view of an "ability district” than that called for in section 5. In fact, he stated that if "the 25th District is a protected district, then it is hard to see how any other majority Democratic district, assuming it had at least one eligible minority resident, would not also be a protected district.” Pl.’s Ex. 175, Pre-Filed Direct Test, of Dr. John Alford 28-29. And we did not rely on Dr. Alford's similar concession that SD 10, under his metric, was an ability district. Trial Tr. 39:5-21, Jan. 25, 2012 AM.

. In contrast, the smaller counties of Caldwell, Colorado, Fayette, Gonzales, Hays, and Lavaca are all wholly contained within CD 25 and are not addressed in either the anecdotal testimony or Dr. Ansolabehere’s analysis. My colleagues state that "[n]o party, including Texas, presented any evidence regarding the tri-ethnic coalition's performance in the six smaller counties wholly contained in Benchmark CD 25.” CD 25 Majority Op. at 185 n. 11. They are mistaken. We received evidence indicating that the tri-ethnic coalition was ineffective in these counties. In 2010, Republican candidates won (and the tri-ethnic coalition lost) all eighteen elections held within Gonzales and Lavaca Counties. PL’s Ex. 34, at 49-52, 189-92. The tri-ethnic coalition fared little better in Hays County, where Democrats won only one of twenty-two elections, and Caldwell County, where Democrats won only two of eighteen. Id. at 165-68. *194 According to the Texas Secretary of State, the tri-ethnic coalition lost all twenty-three elections in Colorado County in 2010 and all nineteen elections in Fayette. See Historical Election Results, Tex Sec'y of State, http:// www.sos.state.tx.us/elections/historical/index. shtml (last visited Aug. 16, 2012) (official website of the Texas Secretary of State listing past election results). Thus, the tri-ethnic coalition prevailed in only three of one hundred and twenty elections held in these counties in 2010. My colleagues would have us disregard this data because "the majority of voters in these counties are not part of the tri-ethnic coalition,” CD 25 Majority Op. at 185 n. 11. But nowhere else do we examine only a subset of a district to determine the district’s ability status. To determine voting dynamics in CD 25, we must examine CD 25.

. My colleagues concede that Dr. Ansolabehere does not “cover all possible useful data,” but they argue that Travis County data is useful nonetheless because "one must necessarily look to the performance of the coalition in other subdivisions, such as in Travis County.” CD 25 Majority Op. at 185. But it is a far jump from useful to conclusive. My colleagues give no indication, for example, why such an analysis would not include even a passing glance at the six “other subdivisions” that are wholly contained within CD 25.

. The regression analysis Dr. Ansolabahere provides is also not without its flaws. Dr. Ansolabehere uses VAP, not CVAP, in his calculations. Ansolabehere Rep. attach. 3. The HCVAP of CD 25 is 25.3%; its HVAP 34%. We are left to guess if this significant difference between citizen and noncitizen minority population, a highly relevant factor in light of citizen voting requirements, would change his conclusions. Moreover, there are unexplained discrepancies in Dr. Ansolabehere's data. He states that Hispanics comprised 83% of Doggett’s coalition in 2008, id.., but his retrogression calculation appears to indicate that figure was 93%, id. attach. 4. And he calculates Black support for Doggett in 2008 *195 at 111%. Id. attach. 3, an overestimation by (at least) 11%. These problems are additional reasons why I am hesitant to find that this evidence supports finding that CD 25 is an ability district. At a minimum, it is not "more exacting evidence.”

. To be clear, I do not think that we should engage in this type of endeavor. In my view, the fact that the experts in this case did not provide sufficient information to show ability to elect should be the end of the inquiry. I set out this analysis only because my colleagues do not share my view that Dr. Ansolabehere’s data, as presented, is insufficient.

. Assuming that Dr. Ansolabehere is correct, I calculate turnout in the following manner. In 2008, Rep. Doggett received 65.82% of the vote. Pl.'s Ex. 31, at 10. In 2010, he garnered 52.82%. Pl.’s Ex. 32, at 13. This change, according to Dr. Ansolabehere’s data, was due almost exclusively to the decrease in Anglo support for Rep. Doggett from 53% to 37% (the only other change was an increase in Rep. Doggett’s Hispanic vote share from 83% to 86%, which is negligible and within the standard margin of error). Thus, a 16% change in Anglo preferences (53% — 37%) triggered a 13% change in votes for Rep. Doggett’s vote share (65.82%-52.82%). This implies that Anglos comprised 81% of the total number of votes cast in 2008 and 2010 (13%/16% = 81.25%). While this analysis is imperfect — relative turnout among minority groups (as opposed to overall turnout, which my colleagues cite, CD 25 Majority Op. at 188 n. 19) could have changed between elections — it is the best we can accomplish with the limited data provided by Dr. Ansolabehere. As discussed above, I conclude that Dr. Ansolabehere failed to provide any evidence regarding turnout data, and so would prefer to stop my analysis there. I engage in this calculation only because my colleagues find Dr. Ansolabehere’s analysis to be persuasive.

. My colleagues reject this data based on a single comment by Dr. Alford, Texas’s expert, during oral argument. CD 25 Majority Op. at 143-44. But Dr. Alford addressed the OAG’s racially polarized voting analysis concerning the House, not the Congress. Trial Tr. 86:12-87:7, Jan. 24, 2012 PM. And he compared a different subset of that data than my colleagues do. Compare id. at 86:19-20 ("[I]f you'll take a quick look at the last two columns [of the data] .... ” (emphasis added)), with CD 25 Majority Op. at 187 (discussing the difference between "estimated turnout % in district” and "actual turnout % in district,” Pl.’s Ex. 24, at 576, which are the third to last and the last columns.). In other words, Dr. Alford’s concern is not the same as my colleagues'. Moreover, Alford and my colleagues raise concerns about different data than I examine here. He critiqued the total estimated turnout calculated "as a percent of VAP,” Trial Tr. 85:23-87:7, Jan. 24, 2012 PM (discussing Defs.’ Ex. 6, at 358), i.e., what percentage of eligible voters in a minority group voted in an election.
Neither Alford nor my colleagues assess the OAG's calculations concerning "distribution of votes in [a] contest,” Pl.’s Ex. 24, at 579, i.e., what percentage of votes in any given election was cast by each minority group. Unlike the data my colleagues examine (and on which I do not rely in any way), this analysis accurately predicts the actual overall turnout in a given election, including every election my colleagues identify as problematic. Compare Pl.’s Ex. 24, at 587-88 (predicting 190,223 votes in the 2010 general election when 173,309 were actually cast, resulting in an error rate of 9.8%), with CD 25 Majority Op. at 144 (calculating an error rate in 2010 of 43.6%); Pl.'s Ex. 24, at 587 (predicting that 300,273 votes were cast in the 2008 general election when 282,161 votes were actually cast, resulting in an error rate in 2008 of 6.4%), with CD 25 Majority Op. at 144 (calculating an error rate of 51.4%); Pl.'s Ex. 24, at 587 (predicting that 172,695 votes were cast in the 2006 general election when 159,507 were actually cast, resulting in an error rate of 8.2%), with CD 25 Majority Op. at 144 (calculating an error rate of 28.1%). Additionally, this data predicts the "number of votes cast by [each] minority group,” see PL’s Ex. 35, at 585-89, despite my colleagues’ apparent statements to the contrary. CD 25 Majority Op. at 188 n. 18.
My colleagues state that "there is no testimony, expert or otherwise, in the record that the data on which the dissent relies is not as flawed as the turnout numbers rejected by Dr. Alford.” Id. But my colleagues would discard the State House OAG data (and, by extension the Congressional OAG data) based on the metric Dr. Alford described in his testimony: the gap between the predicted turnout and "real life.” Id. at 143-44. I use that same metric — the only ground Dr. Alford gave as support for his critique — to test the data. My colleagues also note that "Texas’s failure to cite to this data again indicates to the Court that it has little probative value.” Id. at 188. While I am skeptical that our assessment of evidence contained in the record should be influenced by whether a particular party chose to cite it, I note that the United States cited the OAG turnout data favorably. See U.S. Proposed Findings of Fact ¶¶ 24, 54, 58, 163, 197.
Finally, it bears reemphasizing that even if my colleagues’ concerns were serious enough to warrant discarding this data entirely, the proper consequence should be to conclude that Dr. Ansolabehere’s analysis is not the "more demanding evidence” necessary to prove a coalition district. As I have explained above, turnout data is the only way to provide context for the data on which my colleagues rely so heavily. My attempt to provide that missing data should not detract from the more important fact: Dr. Ansolabehere’s report does not include this essential information at all.

. Even assuming that the 2010 election alone did rise to that high level of proof (which I do not believe it does), we have previously stated in the context of SD 10 that a single election does not indicate a proven history of ability to elect.

. The only way for legislators to review the information presented during these hearings was to obtain from the Committee Clerks any material submitted during the field hearings, or by viewing the hearings by webcast. Trial Tr. 114-15, Jan. 17, 2012 AM (Rep. Hunter).

. The focus of the legislative redistricting efforts during this session was on the State House and Senate plans, which, if not enacted during the regular session, would have been determined by the Texas Legislative Redistricting Board. Trial Tr. 59-160, Jan. 18, 2012 AM (Downton).

. Representative Dukes did not explain why she first saw the map on June 9 when the map was publicly released on May 31, 2011.

. Three Representatives voted “present.”

. Congressional districts must be drawn within one person of the ideal district size. Congressional districts therefore must be “zeroed out” by the mapdrawer, meaning that the district must deviate from the required population by at most one person. Trial Tr. 91-92, Jan. 18, 2012 AM (Downton); Trial Tr. 71-72, Jan. 25, 2012 PM (Interiano). Based on the 2010 Census, the ideal population for each of the 36 congressional districts in Texas is 698,-488. Joint Stipulations, ¶ 15.

. Mr. Downton later clarified that although "Dallas County itself lost population relative to the rest of the Stated Tarrant County on the west and Colin and Denton counties on the north gained population.” Trial Tr. 62, Jan. 18, 2012 AM (Downton).

. The TLC is an agency within the legislative branch of the Texas State government that provides nonpartisan, technical support and services to each member of the Legislature. Archer Dep. 8-9, Oct. 12, 2011.

. By contrast, Texas argued at summary judgment that any district with a Black voting age population of 40% or more is an ability district. PL's Mem. in Supp. of Mot. for Summ. J., ECF. No. 41, at 30.

. Mr. Interiano testified that at the time of this email, Eric Opiela was his colleague doing political work for Speaker Straus. Trial, Tr. 54, Jan. 17, 2012 PM (Interiano).

. Representative Dukes testified that this coalition includes "multiple democratic organizations. There is the Black Austin Democrats, the Tejano Democrats, the Mexican-American Democrats, the lesbian-gay, or Stonewall Democrats, there's the Central Austin Progressives, there’s the University Democrats, the Northwest Democrats that help northeast, and the list goes on and on and on and on, coupled with labeled [sic] organizations, especially the Central Labor Counsel [sic] made up of 15 labor unions, the police association, fire fighters, all working together, and the candidates work very hard to get the endorsements because they will go out and work the community, through literature and create a slate. It is very rare, if you have that coalition's support that you are not successful in winning.” Trial Tr. 85, Jan. 19, 2012 PM (Dukes).

. Mr. Escamilla stated that since 2002 minority candidates have prevailed in 34 countywide elections in Travis County, 18 of whom were Black and 16 were Hispanic. Defs.’ Ex. 735, at 8. He did not provide the total number of countywide elections from which this information is draw, which undermines the usefulness of this evidence in evaluating the ability of minority voters in the district.

. CD 34, one of four new districts created in the Congressional Plan, is located in southeast Texas, and includes De Witt, Goliad, Bee, Jim Wells, Kleberg, Kenedy, Willacy and Cameron counties, as well as portions of Hidalgo County, San Patricio County, and Gonzales County. Pl.’s Ex. 12, at 1. All parties agree that proposed CD 34 provides Hispanic citizens living in the district the ability to elect candidates of their choice. Defs.' Ex. 726, at 4. Specifically, CD 34 has an HVAP of 79%, an HCVAP of 71.7%, and an SSVR of 71.9%. Defs.’ Ex. 885; PL's Ex. 12, at 9. Chairman Seliger testified that he created CD 34 because he felt he was required to create a Hispanic district in South Texas, particularly after the loss of CD 27. Defs.' Ex. 776 (Seliger Dep. 25-26, Sept. 1, 2011); Trial Tr. 18, Jan. 24, 2012 AM (Chairman Seliger).

. While not precisely the same, the parties agree that VTDs are essentially the same as voting precincts.

. Mr. Interiano testified that another Hispanic opportunity district could have been drawn. Because he was discussing retrogression the Court finds that he was testifying to the possibility of an additional Hispanic ability district. Trial Tr. 35, Jan. 17, 2012 PM (Interiano) ("Q. And you agreed also with me that it was possible to have avoided retrogression in [the] house plan by creating a Latino Opportunity District elsewhere in the state, but you did not do that? A. That's correct. And that was due to the fact that this being a member-driven map — in many circumstances, the delegation bought us a map where they had all agreed to it — we were not going to be asking them to make changes to it unless we believed that it was required by the Voting Rights Act or any other law. But at this point, we felt comfortable that the fact — with the map, that it was a legal map.”). A minority opportunity district is meaningful under Section 2 of the VRA, which is concerned with whether minority "voters have less opportunity than other members of the electorate to ... elect representatives of their choice.” 42 U.S.C. § 1973(b).

. Mr. Hanna prepared various memoranda during the redistricting process that noted Section 5 problems with the developing map. See PL's Ex. 3 (April 6, 2011); Pl.’s Ex. 4 (April 10, 2011); Pl.’s Ex. 5 (April 20, 2011). Mr. Interiano reviewed all of these memos, Trial Tr. 175-78, Jan. 17, 2012 AM (Interiano), although he identified no significant changes or actions he took as a result.

. Mapdrawers for the State House used non-suspense data with respect to SSVR, instead of total voter registration data. Trial. Tr. 181-83, Jan. 17, 2012 AM (Interiano). According to the Texas Secretary of State’s website, "[a] suspense voter is a voter known to have an incorrect address or outdated address. The county has sent the voter a form to obtain a new current address, but no response has been received. The voter is however considered to be an active voter for voting purposes.” Texas Secretary of State's Voter Registration Public Information Request Form, http//www.sos.state.tx.us/ elections/forms/pi.pdf, (last visited Aug. 10, 2012). The Court takes judicial notice of this information and all SSVR numbers referenced are non-suspense numbers for 2010.

. VAP represents voting age population.

. The County Line Rule was broken in Henderson County to comply with the federal one-person one-vote requirement. Trial Tr. 85-86, Jan 20, 2012 PM (Chairman Solomons).

. SSVR may also be referred to as SSRV (Spanish Surname Registered Voters).

. MALDEF wrote to Chairman Solomons on April 27, 2011, stating that it considered HDs 90 and 148 to be Benchmark ability districts so that raising their SSVR in the State House Plan would not create new ability districts. Dels.’ Ex. 649, at 2.

. In this instance, the Court cannot make a finding that Mr. Interiano was discussing a potential ability district, because this portion of his testimony is unclear.

. Chairman Solomons testified that he decided that there would be 24 not 25 districts in Harris County in the State House Plan based upon the "advice of counsel." Trial Tr. 1567, Perez v. Perry, Sept. 13, 2011 (Chairman Solomons).